## Commonwealth *v.* Martinolich, Appellant.

Argued November 20, 1973. Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy, Nix and Manderino, JJ.

*Clement James Cassidy,* with him *Joseph M. A. Nelabovige,* for appellant.

*Grant E. Wesner,* Deputy District Attorney, with him *Robert L. VanHoove,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, March 25, 1974:

Appellant Robert J. Martinolich is here on direct appeal from a conviction of murder in the first degree.[1] He presents several assignments of error, none of which requires reversal. Accordingly, we affirm.

During the evening of August 12, 1969, twenty year-old Glenn Eckert and eighteen year-old Marilyn H. Sheckler disappeared. They had been out together on a date. Six days later, the car Eckert had been driving on the night of his date was found abandoned on Railroad Street, in Leesport, Pennsylvania. In the car were the couple's shoes, and $489.23, the exact amount of receipts of the father's store for August 12. At this time, the police considered the disappearance an ordinary case of young people running away.

---

[1] Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. II, §202(1), 17 P.S. § 211.202(1) (Supp. 1973).

However, leads provided by James Musa Eways and Harlin Bailey led police to search the wooded area immediately southeast of Dreamland Park, an abandoned amusement park just outside the city limits of Reading. After weeks of searching by local and state police, on October 23, 1969, Trooper Robert A. Kaunert spotted sunlight reflected from a pair of sunglasses, which, upon investigation, were in direct contact with the skull of a decomposed body. The body was later identified as Glenn Eckert's.

The Commonwealth's case against appellant for the murder of Glenn Eckert consisted of circumstantial evidence and the testimony of Eways and Bailey. Both men related substantially identical accounts of the events.

Eways testified that one Leroy Stolzfus, appellant, Bailey, and he were all members of a motorcycle club, called the "Pagans." An abandoned theater at Dreamland Park served as a clubhouse for their organization. In the early morning hours of August 13, 1969, the four "Pagans" left their clubhouse to look for girls. They decided their best chance would be to find a couple "parking," to "train"[2] the girl, and then to scare the couple into not saying anything about the rape. After a short time driving around, the four came across a young couple parked in a "light blue, '64, 4-door" Ford.

While Eways waited at the driver's seat of their Econoline van, the other three got into the Ford. With Bailey driving, the three, holding the young couple captive, followed the van to an abandoned railway

---

[2] The witness explained in the following fashion the verb to "train": "Q. [Defense counsel] Would you please tell the jury what you mean by 'train' her? What do you do when you train a girl? A. [Eways] All of us have sexual relations with the girl. Q. In other words, if there are seven of you, the seven would have sexual relations with the one girl? A. Yes. Q. That's training a girl? A. Yes."

station in Leesport. Bailey parked the car there, but kept the ignition keys. The three "Pagans" and the young couple entered the van. Bailey sat in the passenger seat; Stolzfus and appellant were in the back with the young couple.

After a short time, the two in the front of the van switched places with Stolzfus and appellant. Both Bailey and Eways admitted in court that they forced the young woman to have sexual intercourse with them. Again, the two groups switched places.

Eways then drove the van to Dreamland Park but upon approaching it, discovered two police cars parked across its entrance. Unknown to the four, the police were at Dreamland Park to arrest the "Pagans" for the alleged beating and stabbing of three young men earlier that night. The four decided to drive on. After randomly driving for some time, a second attempt was made to return to the clubhouse. But the police were still there.

This time, according to Eway's testimony, appellant told him to stop the van and let everyone out. He complied and Bailey, Stolzfus, appellant, and the young couple exited from the van about one-quarter mile south of Dreamland Park.

Bailey testified to substantially the same version of events. He also described what happened when the three "Pagans" and the young couple left the van. After walking a short distance, appellant gave Bailey his telephone book and told him to make certain calls. Bailey then left Stolzfus and appellant with the young couple.

The calls were never made because Bailey was unable to locate an operating telephone. As daylight was breaking, Eways saw Bailey hitchhiking and stopped the van for him. Eways had driven around for most of the morning, and unsuccessfully tried several times to return to the clubhouse.

Bailey and Eways drove into a gasoline station, where they were arrested for the August 12 beating of the three young boys. They were searched. Keys, which were later identified as those for the car Glenn Eckert had been driving on August 12, and appellant's telephone book were seized from Bailey.

Bailey also testified that appellant and he talked together while in prison. That conversation was described at trial. "By Mr. Van Hoove [District Attorney] : Q. Was there any subsequent conversation between you and Mr. Martinolich concerning the boy? A. [Bailey] At another time there was, sir. Q. Do you recall when that was and where it was? A. That was later on, in the same afternoon, in the [prison] yard again, and at this time we were in the presence of another—Leroy Stolzfus, Martinolich and myself were in the yard. Q. Referring to the matter involving the boy, would you tell us, to the best of your recollection, the exact conversation between you and Mr. Martinolich? A. I asked Martinolich like, what had happened, and at this time, he told me that he asked the boy, Martinolich like asked the boy, what it was worth for him to live, and the boy laughed at him, he told me, and so he said that he shot him. Q. With regard to the boy, did Mr. Martinolich say anything further regarding the shooting of the boy? A. He told me, at that time, to keep quiet about it because I was the only one that knew about it, and if it ever got out that he'd get me for it. Q. Did he say—did Mr. Martinolich tell you where he had shot the boy; in what area? A. He said in the head, sir." Both Eways and Bailey testified that appellant was in possession of a handgun when the four of them left Dreamland Park.

Appellant denied any involvement in the death of Glenn Eckert. He stated that during the critical hours Stolzfus and he were hiding from the police under the floor of one of the buildings in Dreamland Park.

On the basis of all the evidence the jury chose to accept the Commonwealth's version of the facts. Appellant was found guilty of murder in the first degree, and was sentenced by the jury to life imprisonment with a recommendation of no parole.

No challenge is here made to the sufficiency of the evidence. Appellant argues that various asserted errors, which occurred in the course of an eleven-day trial, were so prejudicial that he was denied due process of law. We disagree. The record amply demonstrates that appellant received a fair trial.

## CHANGE OF VENUE

Appellant's first assignment of error is that the trial court improperly denied his motion for a change of venue.[3] Appellant argues that the existence of substantial, adverse pretrial publicity deprived him of his right to a fair trial. Dispositions of motions for a change of venue are within the sound discretion of the trial court. *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974); *Commonwealth v. Hoss,* 445 Pa. 98, 107, 283 A.2d 58, 63 (1971); *Commonwealth v. Swanson,* 432 Pa. 293, 299, 248 A.2d 12, 15 (1968), cert. denied, 394 U.S. 949, 89 S. Ct. 1287 (1969). On this record there was no abuse of discretion.

In its opinion the court en banc stated: "The alleged crime in this case was committed on or about August 13, 1969. Defendant was charged with the crime several months thereafter. On November 20, 1969 he was arraigned, and a plea of not guilty was entered. The case was listed for trial in December 1969. At the request of defendant, a continuance was granted because of publicity relating to the case and to permit

---

[3] To avoid prejudice to appellant, the trial of Leroy Stolzfus for the murder of Marilyn Sheckler was severed from appellant's trial.

142

counsel additional time for preparation .... Again, in March 1970, a continuance was granted for similar reasons. When the case came to trial on June 1, 1970, we are satisfied that the effect of any publicity had abated and the selection of the jury was not influenced by any such publicity." *Commonwealth v. Martinolich*, 65 Berks County L.J. 99, 113 (Pa. C.P. 1973) (HESS, J.).

This conclusion is fully supported by the record. Defense counsel at the March, 1970 hearing offered several newspaper accounts as proof of overwhelming community prejudice against appellant. However, many of these articles describe only the unrelated incident of the August 12 beating of the three young men, and others speak of the unexplained disappearance of Eckert and Sheckler. It is true that a few newspaper stories are written in the graphic style endemic to journalism, but their total number is small.[4] Most of the newspaper articles in the record are simply straightforward accounts of the police investigation, judicial proceedings, and other matters in the public record.[5] Moreover, after viewing the defense's presenta-

---

[4] The most graphic description of Eckert's killing appeared in Inside Detective (Feb. 1970, at 16), a magazine with a national circulation. The record discloses that in Berks County at the time in question approximately 150 copies of this magazine were sold each month. Even Inside Detective's presentation of the facts relied largely upon the testimony at appellant's November, 1970 preliminary hearing.

[5] Appellant further contends that the prosecution released information to the press in violation of *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209, cert. denied, 414 U.S. 878, 74 S. Ct. 164 (1973), and that therefore he is entitled to a new trial. Our review of all newspaper and magazines articles placed in the record reveals no indication that the police or district attorney's office breached any of the *Pierce* guidelines. Id. at 200, 303 A.2d at 215. Indeed, one newspaper story reported the following exchange between the district attorney and the press:

tion of these newspaper articles, the March, 1970 hearing judge granted a three-month continuance.

When appellant's trial began in June, defense counsel offered no additional newspaper accounts in support of his motion for a change of venue. Rather, the defense proceeded on the theory that the voir dire examination of the jury panel would make apparent the need for a change of venue.

The court en banc accurately sets forth the circumstances of voir dire. "A total of 70 prospective jurors were questioned. The Commonwealth challenged 21 for cause, and defense challenged 16 plus one additional, . . . upon which a challenge for cause was refused, and the defense then exercised its first peremptory challenge . . . . There were no other objections to challenges for cause, and in most instances the challenges were sustained by agreement or

"For the benefit of the news media, Van Hoove [district attorney] made a short statement in which he said the homicides took place sometime on the evening of Aug. 12 or in the morning of Aug. 13. He said both were in prison as result of incidents at Dreamland Park on Aug. 12.

"Questioned about where the deaths took place, Van Hoove replied: 'Other than what has been stated or that is within the knowledge of news media, this would be considered evidence.'

" 'To say anything further would of necessity require me or the state police to go into evidence. The more appropriate place of disclosure or comment will come out at the preliminary hearing or in court,' he declared.

" 'I respectfully decline to comment further on evidence in the case,' Van Hoove apologized." Reading Times, Oct. 30, 1969, at 16, cols. 3-4. Although the questioning persisted, according to the news account, the district attorney continued to say nothing more than "no comment." See *Commonwealth v. Pierce*, supra; ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial & Free Press §§ 1.1, 2.1, 2.2 (Approved Draft, 1968); ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function, §§ 1.1, 1.3 (Approved Draft, 1971).

without opposition. The Commonwealth exercised only 3 peremptory challenges and the defense exercised 10 during the selection of the 12 jurors, and 1 during the selection of the alternates. By agreement of counsel, 5 prospective jurors were excused for one reason or another." 65 Berks County L.J. at 112.

Of the twelve jurors and two alternates selected, thirteen testified to reading newspaper accounts but swore that they had not formed an opinion of appellant's guilt or innocence. One juror testified that she had never seen anything in the news media about Eckert's death. Every defense challenge for cause, save one, was sustained. And appellant exercised only eleven of twenty peremptory challenges. See *Commonwealth ex rel. Ryan v. Rundle,* 411 Pa. 613, 617, 192 A. 2d 362, 364, cert. denied, 375 U.S. 948, 84 S. Ct. 358 (1963). Furthermore, the record indicates that appellant himself participated in the selection of jurors and apparently was satisfied that the jury selected and sworn was fair and impartial.[6]

---

[6] The record discloses the following exchange between the trial court and defense counsel before the jury was sworn: "THE COURT: Yes. That's all right. The final thing I would like to place on the record is, I have noted throughout the selection of jurors— and I watched carefully to observe it—that almost continually the defendant was in consultation with his attorneys, and it would appear, although I certainly don't want to invade the counsel-client relationship, that he actively participated in the action upon all of the jurors. Is that correct? MR. CASSIDY [Defense counsel] : Yes, Your Honor, that's correct. THE COURT: You're satisfied that he understood the manner in which you passed jurors and challenged jurors? MR. CASSIDY: In my opinion he is satisfied. From what he has said, I would say he is satisfied. THE COURT: Well, I certainly don't want to ask him, but I think it should be on the record, if he ever raises a question, because my observation was, throughout the entire period, that he seemed interested and was continually in consultation with you, and on occasions I noted him nodding his head affirmatively, or negatively, so it would appear to me—and I was satisfied from what I saw—that he was in

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases." *Irvin v. Dowd,* 366 U.S. 717, 722-23, 81 S. Ct. 1639, 1642 (1961).

The trial judge, then President Judge HESS, found that the jurors were not prejudiced against appellant as a result of claimed adverse pretrial publicity. The judge was satisfied, as apparently were appellant and his counsel, that each juror would decide the case solely on the evidence adduced at trial. We find no abuse of discretion in the trial court's refusal to grant appellant's motion for a change of venue. See *Commonwealth v. Yount,* supra.

### VOIR DIRE

Appellant's second claim is that he did not receive a fair trial because the trial court refused, after timely motion, to exclude jurors already selected from the courtroom during the continuing voir dire examination. Prejudice, it is argued, resulted from the selected jurors hearing prospective jurors reply affirmatively to the question whether they had an opinion of appellant's guilt or innocence. Repetition of the affirmative replies transformed, according to appellant, "accepted and acceptable" jurors into biased and prejudiced ones. We find no merit in this assignment of error.

The court en banc analyzed appellant's contention in this fashion. "The trial judge ordered prospective

---

fact participating and understood what was going on. MR. CASSIDY: Oh, he understands what is going on."

jurors excluded during the questioning of individual jurors as allowed by Rule 1106(b) of the Rules of Criminal Procedure, but refused to exclude jurors once accepted by both parties. This ruling was based upon the fact that facilities for such purpose in or near the courtroom were lacking; the trial judge agreed to sequester the jurors as provided by Rule 1111, and deemed it necessary to keep accepted jurors in the courtroom where they would be certain to be together, not wander about and come into contact with evidence of the security arrangements existing in the Courthouse; and for the final reason that counsel could point to no rule authorizing or requiring such procedure or appellate court precedent for following it. We are completely satisfied that the procedure utilized for selecting the jurors was fair and impartial, the jury was unbiased and decided the issue solely on the evidence . . . ." 65 Berks County L.J. at 113-14.

The court en banc was assuredly correct in concluding that rule 1106(b) does not compel the exclusion from the courtroom of selected jurors during voir dire.[7] Whether to exclude selected jurors from the ongoing voir dire examination is a trial matter and accordingly is committed to the sound discretion of the trial judge. Although the more desirable practice is to exclude, where feasible, selected jurors from voir dire so that any possibility of their being tainted by questions asked or answers elicited during voir dire is negatived, on this record we can find no abuse of discretion.

It was the defense which vigorously sought to keep from the jury any display of the security surrounding appellant. And the defense moved for the sequestration

---

[7] Rule 1106(b) of the Pennsylvania Rules of Criminal Procedure provides: "The voir dire of prospective jurors shall be conducted individually and may be conducted beyond the hearing and presence of other jurors."

of jurors. Pa. R. Crim. P. 1111. The trial judge was confronted with several possibilities of prejudice to appellant, and the problems required conflicting solutions. In the reality of the trial atmosphere, the judge chose the path which in his discretion most effectively avoided any possibility of prejudice. His judgment reflected a sound exercise of discretion.

More fundamentally, we fail to discover in the voir dire record the existence of any prejudicial event or incident that conceivably could have tainted the selected jurors. Appellant points to the fact that selected jurors heard prospective jurors reply affirmatively to the question whether they had an opinion of appellant's guilt or innocence.[8] Of the twelve jurors and two alternates selected and sworn, thirteen stated that they had formed no opinion of appellant's guilt or innocence; one admitted to having formed an opinion but swore she could set it aside. Of all jurors examined during voir dire, not a single one was asked whether he thought appellant was guilty; not one stated he thought appellant guilty. Each juror was asked simply whether he had formed an opinion of appellant's guilt or innocence. In this context, an opinion does not necessarily mean one of guilt.

The right to a trial by an impartial jury[9] does not preclude from jury service persons who admit to having

---

[8] This questioning was entirely proper. This Court has repeatedly stated that "[t]he only legitimate inquiry in this area [to secure a competent, fair, impartial, and unprejudiced jury] was whether or not the juror had formed a fixed opinion in the case as to the accused's guilt or innocence." *Commonwealth v. Lopinson*, 427 Pa. 284, 298, 234 A.2d 552, 561 (1967) ; see *Commonwealth v. Johnson*, 452 Pa. 130, 134-135, 305 A.2d 5, 7 (1973) ; *Commonwealth v. Ravenell*, 448 Pa. 162, 175, 292 A.2d 365, 371-72 (1972) ; *Commonwealth v. Hoss*, 445 Pa. 98, 107, 283 A.2d 58, 63 (1971) ; *Commonwealth v. Swanson*, 432 Pa. 293, 300, 248 A.2d 12, 16 (1968), cert. denied, 394 U.S. 949, 89 S. Ct. 1287 (1969).

[9] U. S. Const. amends. VI, XIV; Pa. Const. art. I, §§ 6, 9.

formed an opinion of a defendant's guilt or innocence but attest to being able to set it aside. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 1642-43 (1961).

It is difficult to see how the repetition of affirmative responses to the question whether a juror had an opinion of appellant's guilt or innocence planted in the minds of "accepted and acceptable" jurors, bias and prejudice against appellant. Moreover, to adopt appellant's argument would be to conclude that the jurors during trial violated their oath to decide the case solely on the evidence presented. This conclusion cannot be supported by appellant's unsubstantiated allegations of prejudice and lack of impartiality.

### IMPROPER COMMENT

Appellant also focuses on an allegedly improper remark by the prosecutor. It is not urged that the district attorney's remark was an impermissible comment on appellant's constitutional right not to incriminate himself, since appellant voluntarily chose to testify in his own behalf. Rather, appellant claims that he was deprived of a fair trial because the district attorney, with knowledge that Stolzfus was a co-defendant and therefore if called as a witness could have refused to testify, mentioned to the jury that appellant had not called Stolzfus to verify his version of what happened in the early morning of August 13. In these circumstances, appellant argues, the Commonwealth's attempt

to exploit an inference that Stolzfus, if called, would not corroborate appellant's testimony constituted a denial of due process. We disagree; both the trial court's immediate instruction and his later charge to the jury satisfactorily remedied any prejudice.

The assertedly improper observation occurred during the Commonwealth's closing argument. The record discloses the following: "Mr. Van Hoove [District attorney]: Going on to Martinolich's testimony, if in fact the events occurred as Robert Martinolich said, you may consider the absence of Leroy Stolzfus, because Leroy Stolzfus could have verified for you in this case Robert Martinolich's tale. Mr. Cassidy [Defense counsel]: Objection, Your Honor, and I call for a mistrial. The Court: Mr. Van Hoove, you know as well as I do that Mr. Stolzfus is under other charges and is being tried at this time. He can't be called to testify. I don't think you should comment on his not being here. I will tell the jury in my charge to definitely not consider that. The motion for a mistrial is refused, with the correction I have made. The jury should in no way consider Leroy Stolzfus' absence in this case."

Whatever possible prejudice towards appellant may have been generated as a result of the prosecutor's comment was immediately neutralized by the trial court's admonition to the jury. See *Commonwealth v. Lowery*, 440 Pa. 361, 365-66, 269 A.2d 724, 726 (1970). Not only did the judge instantaneously instruct the jury to disregard Stolzfus' absence, but he later gave a full and adequate charge on the subject. "Now I believe this is the first time I have injected Stolzfus' name into the case. As was indicated to you during the speeches of counsel, when it was intimated he could have been here as a witness, he stands charged also for some aspects of this case and I said then that he couldn't be here

and I instructed the jury they should in no way consider adversely to the defendant the statement that 'Why wasn't he called?' because in this case he would have had certain rights and he is not on trial. In fact, I am going to go further at this point and say that in this case you are required to pass upon the guilt or innocence of one individual, Robert Martinolich, and no others." The defense made no objection to the charge in whole or in particular part.[10]

We completely agree with the assessment of this incident by the court en banc. "It is clear from the record . . . that the trial judge politely chastised the district attorney and emphatically, at the time of the remarks and in the charge, instructed the jury not in any way to consider the absence of Stolzfus. As we view the record, the trial judge by his remarks was more harmful to the Commonwealth's case than was the district attorney to the defendant's case." 65 Berks County L.J. at 102-03. Moreover, this remark was the sole improper reference by the prosecution in an eleven-day trial. We conclude that the trial court properly refused to grant appellant a new trial on the basis of the district attorney's comment.[11]

---

[10] Appellant further argues that the judge's charge did not adequately cure the erroneous belief, planted in the jury's mind by the prosecutor's comment, that appellant was required to produce Stolzfus as a witness. However, no objection was made to the trial judge's charge. And when asked by the judge whether anything should be added to the charge, the defense made no request. In this circumstance, this issue may not be heard for the first time on appeal. *Commonwealth v. Yount*, 455 Pa. 303, 318-19, 314 A. 2d 242, 250 (1974) ; *Commonwealth v. Watlington*, 452 Pa. 524, 306 A.2d 892 (1973) ; Pa. R. Crim. P. 1119(b).

[11] Contrary to appellant's assertion, the district attorney's off-handed characterization of appellant's version of the facts as a "tale" does not come within the principles of *Commonwealth v. Toth*, 455 Pa. 154, 314 A.2d 275 (1974) (prosecutor in closing argument unjustifiably distorted testimony of key defense witness; no

## REFERENCE TO GUN

Appellant next argues that he should be granted a new trial because the Commonwealth on redirect elicited an irrelevant and prejudicial reference to a gun in appellant's possession at the time of arrest. The record provides no support for this assignment of error.

The defense in its cross-examination of Trooper Kaunert of the Pennsylvania State Police sought to explore exactly what happened during appellant's August 13 arrest. "Q. [Defense counsel]: You were one of the troopers who questioned the defendant, Robert Martinolich, on August 13, 1969, were you not? MR. VAN HOOVE [District attorney]: I will object, Your Honor, at this point. THE COURT: August 13th? More than two months prior to this? It's not encompassed within the direct examination. I don't know what you have in mind, whether it would relate to what he's testified to before or not. MR. CASSIDY [Defense counsel]: I'm looking to his credibility now, Your Honor. If you will allow a few questions, I think— THE COURT: But you're also aware of the rules of criminal procedure concerning any answers that may have been elicited— if there were any? MR. CASSIDY: I have no objection to that at all. THE COURT: All right. You may be opening the door; I must point that out to you. MR. CASSIDY: Oh, I understand that, Your Honor. If the district attorney will stipulate, I'll put it in. THE COURT: All right. Proceed."

On redirect, the Commonwealth likewise sought to ascertain the facts surrounding appellant's arrest so that the defense's impeachment would not go unchal-

---

curative instruction or charge by trial court); or *Commonwealth v. Revty*, 448 Pa. 512, 295 A.2d 300 (1972) (attempt by district attorney to show defendant was intentionally deceiving jury); or *Commonwealth v. Potter*, 445 Pa. 284, 285 A.2d 492 (1971) (defendant's statement branded by prosecutor as a "malicious lie").

lenged. The following then took place: "Q. [District Attorney]: Calling your attention to the 13th of August, 1969, about which Mr. Cassidy asked you certain questions—first of all, do you know the defendant, Robert Martinolich? A. Do I know him? Q. Yes, sir. A. Yes, sir, I do. Q. Would you point him out in this courtroom? A. He is seated at counsel table, to the right of Mr. Cassidy and Mr. Nelabovige. Q. Did you see Mr. Martinolich on the 13th of August, 1969? A. Yes, sir, I did. Q. Were you in his company? A. Yes, sir, I was. Q. Along with whom, if anyone else? A. Trooper Golden of the state police. Q. Where was this? A. At the State Police Barracks in Reading. Q. Whereabouts in the state police barracks? A. It would be the basement portion, where our BCI is located. Q. What does BCI mean? A. Where they fingerprint and photograph persons that are brought in. Q. Would you relate what the circumstances were and what happened in the fingerprint section that you referred to? A. After he was processed, fingerprinted and photographed, he was told to wash his hands and come back. As he came back, Golden and I were instructed to take him into the next room and obtain the arrest report information —THE COURT: Gentlemen, I want to point out one thing. You're acquainted— You are not objecting? MR. CASSIDY [Defense counsel]: Not yet, Your Honor. THE COURT: You're acquainted with the recent decisions of the appellate court concerning other matters? MR. CASSIDY: Collateral matters. THE COURT: I don't want the issue to come up afterwards. MR. CASSIDY: I'm not objecting yet. THE COURT: All right. BY MR. VAN HOOVE [District attorney]: Q. You and Trooper Golden went with the defendant to another room? A. Yes, sir. Q. Which room would this be? A. The old criminal room, right across from the BCI room. Q. What happened thereafter? A. He was instructed by Trooper

Golden to sit down in a chair that was left of the door as you enter the criminal room, which he did. Trooper Golden stood in front of him and started asking him questions. I stood to his left, leaning on a file cabinet. Q. Pardon me, I didn't hear that. A. I stood to the left of Trooper Golden, or to the right of Mr. Martinolich, leaning on a file cabinet and Trooper Golden proceeded to ask the defendant, Mr. Martinolich questions. Q. What questions? A. He asked him if his name was Juice. The defendant says, 'What's it to you?' Golden then said, 'Is your real name Robert Martinolich?' He says, 'I just gave my real name across the hall.' Golden says, 'I didn't ask you that. I asked you your real name and what about the gun you had on you' The Court: Mr. Cassidy, you're not objecting? Mr. Cassidy: Your Honor, with regard to the last comment from the witness, I will object and ask for a mistrial. The Court: I want to point out, Mr. Cassidy, that it becomes difficult to separate one feature from another. I would have sustained an objection to this whole line of questioning. Mr. Cassidy: Your Honor, I move for a mistrial because of the comment made about a gun. The Court: Motion refused. I gave you an opportunity to object. Do you object now? Mr. Cassidy: We'll object to this line of questioning. The Court: You don't object? Mr. Cassidy: We will object. The Court: Oh, you will object. The objection is sustained. The jury will disregard anything in reference to the last answer as not being pertinent to this case in any way."

These colloquies present a positive record of the trial judge's effort to be scrupulously fair to appellant. The trial court was reluctant to allow any inquiry into the August 13 arrest for fear that appellant might be prejudiced. Nevertheless, the defense insisted. After cautioning defense counsel that he "may be opening the door," the judge permitted the defense's cross-

examination to continue. Again on redirect, the court tried to protect appellant from possible prejudice by several times inviting a defense objection to the prosecution's exploration of the August 13 arrest. The defense declined the invitations. Only after the defense's refusal to object was the "last answer" elicited. In this answer the witness referred to a gun in appellant's possession. At that time, and again after court invitation, the defense objected. Immediately, the trial judge instructed the jury "to disregard anything in reference to the last answer as not being pertinent to this case in any way."

The error complained of was invited; the general subject was introduced into the trial by the defense. Further, the defense as part of its trial strategy refused opportunities to halt entirely the Commonwealth's redirect of the trooper about the August 13 arrest. In any event, whatever prejudicial impact on the jury may have been caused by a reference to a gun in appellant's possession at the time of arrest was satisfactorily cured by the trial judge's immediate instruction to the jury.

## TESTIMONY AT VARIANCE WITH OFFER

The next assertion of error involves the testimony of an expert witness which was at variance with the Commonwealth's offer of proof. Appellant claims that the effect of this trial mistake, even though corrected by the court, was so prejudicial that it deprived him of his right to a fair trial. We disagree with appellant's evaluation of the incident.

The court en banc fairly states the record facts. "While it was the Commonwealth's contention that Eckert died as a result of a bullet wound, no bullets were recovered, no comparison tests could be made, and no weapon was connected with the victim's death. In spite of this, two weapons, Exhibit 48, apparently in possession or control of the witness Bailey, and Ex-

hibit 49, found in the possession of the defendant when he was arrested, were introduced into evidence, along with Exhibit 50, cartridges, by agreement of both sides . . . . In fact, the record clearly indicates . . . that defense counsel, more so than the prosecuting attorney, desired that the guns be admitted into evidence. Thereafter, the Commonwealth called a weapons expert to testify relative to types of bullets. The offer of proof . . . was: 'May it please the Court, the Commonwealth intends to prove by this witness, in relation to both Exhibits 48 and 49, that neither gun fires a jacketed bullet.' No objection was offered, apparently for the reason that an expert witness had testified that in his opinion the cause of death was the result of a jacketed bullet passing through the skull. In spite of the offer, the witness testified to the contrary, and stated in effect that steel jacketed bullets could be fired from Exhibit 49 . . . . The defense objected and moved for a mistrial which was refused by the trial judge." 65 Berks County L.J. at 103-04.

The defense asserts that the variance of the evidence from the offer necessitates a new trial. We cannot agree.

First, the court en banc found "that the answer of the witness was as much a surprise to the district attorney as it was to defense counsel. The prosecuting attorney may have been derelict in not making certain what the witness would answer, but we are satisfied that there was no intent to deceive or trick the defense." Id. at 104. The record fully supports this conclusion, arrived at on the basis of the trial court's observation of the concrete realities of trial.

Second, the trial judge instantaneously instructed the jury in the most emphatic fashion not to consider the answer of the Commonwealth's expert. "THE COURT: The motion of defense counsel for a mistrial is

refused. However, I want the jury to in no way be influenced by the last answer given by Mr. Rafter [Commonwealth's expert], insofar as the defendant is concerned, nor to consider it in any way. At sidebar, the district attorney made an offer to prove a certain answer by the witness. As the offer was made, the defendant didn't object. The answer given by the witness, and apparently the correct answer as far as the witness is concerned, was exactly the opposite of what was made in the offer. It is unfortunate that the offer was made in the fashion it was, when the testimony was just the opposite. I ask you to strike out that question and answer and consider it in no way. I'll go even further. Counsel can object to this statement if they want to. In the stipulation, they agreed that no expended bullets were found in the body of the victim or in the area. In the opinion of this trial judge, from many years experience as a defense lawyer, a prosecuting lawyer and a judge in many cases—and I think it's also a fact in science—unless expended bullets are recovered, which definitely can be tied into the wound of an alleged victim, no comparison tests can be made by experts to determine whether any weapon was in fact used to make the wound. Have I correctly stated it? MR. VAN HOOVE [District attorney] : Agreed, Your Honor. THE COURT: Is there any objection to what I have said? MR. CASSIDY [Defense counsel] : No, Your Honor. THE COURT: I have made this explanation to show you why you shouldn't consider this evidence in any way that might harmfully affect the defendant." In the charge to the jury, the trial court again emphasized that because no spent bullets were discovered, no comparisons of guns would be proper.[12]

---

[12] The trial judge in his charge specifically covered the issue of the murder weapon and bullet comparisons. The court stated the

Whatever prejudicial effect the variance of testimony from offer may have had on the jury was more than adequately rectified by the trial judge's forceful instruction to the jury. It is conceivable, moreover, that it was the Commonwealth, and not appellant, who suffered a loss of credibility in the eyes of the jury as a result of the erroneous offer. Finally, the enforcement of offers of proof is within the sound discretion of the trial judge. In the circumstances of this case, we find no abuse of discretion.

### SECURITY MEASURES

Appellant's penultimate contention is that security surrounding appellant was so extensive that the jury was given the impression appellant was a violent and dangerous man. Therefore, appellant was deprived of

following in its charge: "Now, there is no weapon that has been tied in with the alleged cause of death. Under the evidence it is the Commonwealth's theory that it was a hard jacketed or a jacketed bullet. Two weapons have been identified. One is the Derringer [Exhibit 48] that Bailey had which was in the truck, where he said it was, and was found by the police and the other was the gun [Exhibit 49] which Martinolich said he found in this bedding roll at Dreamland Park. No bullets were recovered and so I charge you that you can't conjecture about these weapons or any particular weapon, because if bullets are not recovered, so that a comparison can be made between a suspected weapon and the bullets found in or about the victim, no weapon can be identified as having been the weapon used. What was the death weapon? Where are the bullets? They are not in this case. Of course, their absence is not fatal to the Commonwealth's case. It is a circumstance. But the jury must still be satisfied beyond a reasonable doubt, as I have mentioned 'reasonable doubt' of the death as charged, by the Commonwealth. In other words, that the Commonwealth has made out the three elements I mentioned by the burden I have mentioned, namely, that a death has occurred, that death resulted from a criminal agency and that the defendant is legally responsible for the death as we have defined such responsibility."

a fair trial. The security arrangements[13] were designed to guard against a possible escape attempt by appellant. While appellant was incarcerated waiting for trial, a letter[14] was found that indicated an attempt would be made during trial to free appellant.

---

[13] At no time during trial were the police guarding appellant either uniformed or visibly armed.

[14] The contents of this letter were known to the trial court, defense counsel, and the prosecutor before trial. However, the letter was kept from the public and the jury. At appellant's sentencing, with the agreement of both defense counsel and the district attorney, the letter was made part of the record. The court emphasized that the letter was not found on appellant and that there was no way of knowing whether appellant had any knowledge of the letter. However, in view of the fact that the letter was addressed to "Juice," the sobriquet used by appellant, certain security arrangements were deemed essential to avoid any possible violence. The letter is set out in full.

"Juice I forgot to ask you last night, but its necessary that I know, when I get out and contact your mother, can she be trusted, now I don't mean any disrespect toward your mother, don't get me wrong, but I don't know how she feels about your being involved in this crime, but if your mother is pulling for you whole heartedly and wants you out one way or another then I can feel safe in putting my confidence in her—I just don't want her to spill the beans once she gets an idea whats going to happen, she needn't know directly that I'm going to bust you out even though she may figure as much, but she is going to serve us as a vital function to our plan, she will serve as a go-between, middle man, so to speak. her assignment will be to receive information from you and relaying that information to me, your assignment will be to supply that information needed, such as *when* you will be at the Reading court house basement, what *day* and what *time* you will be there, etc. my assignment, will be to get in touch with flipout and secure the necessary weapons (knifes & guns) and to secure a good fast car and two good men besides myself and flipout—and also to locate and secure a lonely & secluded spot somewhere for a hideout and then after thats all set up we wait until we hear from you. After we receive the information required from you we will then move in to Reading and while one man

At the very beginning of trial, defense counsel notified the court of the possible prejudicial impact of the security measures. The judge unhesitatingly instructed the sheriff's representative to do nothing to prejudice appellant in the jury's mind. "THE COURT: Now, bring in Mr. Kramer, the sheriff's representative. Mr. Kramer, I want to state of record that it would become prejudicial if the jurors saw Mr. Martinolich in the courtroom in handcuffs. I want everything removed from him, that might be an impediment to his freedom, while he's in the courtroom. I don't want to interfere with reasonable precautions by the law enforcement officers, but under the decisions of our courts, the appellate courts, it becomes very important that we preserve the atmosphere of the courtroom in such a manner that the jury is not prejudiced against the defendant. So any time the jury is around, or any witnesses, I don't want any handcuffs put on him, or

stays in the car with the motor running, me, flipout and the other man will inter the basement and put the drop on the hacks and spring you, and then when your armed we will proceed to kill everyone in there, lawyers, hacks anybody and everybody that is in there. I'll kill them. I mean everybody, but everybody will die God dammit—I *will not,* under any circumstances leave a witness alive but I want them killed silently if possible, if we are not forced to use our guns as a means of killing, I want them pricks knocked *out*—and after their knocked out I will personally cut each and every ones head off. and then we will walk slowly out to the car and drive slowly away to the hideout for a cooling off period of at least a week before we start on a killing spree. Now this plan is simple and effective if carried out properly but if you happen to split between now and then, so be it, if not we'll use the plan. but juice one way or the other I'm busting you out, I will not let you die in the chair, if I have to kill a hundred men, women & children to get to you, it matters less to me, but you are coming out. You can believe that. but the main thing I want to know right now, is can I trust your mother fully.

(DESTROY THIS)"

other impediments. The jury should be excused and retired from the courtroom on every occasion when such matters may be necessary."

Appellant asks for a new trial on the basis of an alleged infraction of the trial court's guidelines.[15] The record discloses the following: "MR. CASSIDY [Defense counsel]: Your Honor, in spite of the admonition that you gave to the sheriff, I have for the last five minutes, before you came to court, observed the sheriff standing by the defendant; one within one foot of him and the other within two feet of him; standing right by him in full view of the jury and they stood there for five minutes until I came into the courtroom to my seat, and they sat at their place behind the defendant. I object to this. I say, under the cases, this is prejudicial to this defendant. THE COURT: Well, will you talk to the sheriff, Mr. Van Hoove? MR. VAN HOOVE [District attorney]: I don't know what happened. I wasn't here when whatever Mr. Cassidy is referring to happened.

---

[15] Appellant in his brief states that there were two possibilities that the jury saw appellant unreasonably restrained. However, it is not clear whether the defense objected to the first alleged breach of the trial court's guidelines on security. Questions not raised at trial will not be heard by this Court for the first time on appeal. *Commonwealth v. Agie*, 449 Pa. 187, 296 A.2d 741 (1972). Giving appellant the benefit of a doubt that an objection was made, we are convinced that this assignment of error is without substance. He complains that two alternate jurors, who did not participate in the decision of his case, on a single occasion during an eleven-day trial may have seen police removing handcuffs from him. The court en banc, after reviewing the record, concluded that "the jurors did not see the incident complained of." *Commonwealth v. Martinolich*, 65 Berks County L.J. 99, 108 (Pa. C.P. 1973). Furthermore, the incident, if it were witnessed by two alternates, was harmless beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967); *Commonwealth v. Padgett*, 428 Pa. 229, 237 A.2d 209 (1968); *Commonwealth v. Pearson*, 427 Pa. 45, 233 A.2d 552 (1967).

I came in right before the Judge, Your Honor, did. THE COURT: He wasn't shackled, was he? MR. CASSIDY: No, he wasn't shackled. MR. VAN HOOVE: What was he doing? MR. CASSIDY: They were standing there right by him, both of them on either side, in full view of the jury. MR. VAN HOOVE: I will talk to them again. MR. CASSIDY: For that reason, I move for a mistrial. THE COURT: Motion refused."

The motion for a mistrial was properly denied. There was no possibility that the prejudicial event, if it occurred, ever was seen by the jury. In its opinion the court en banc explains: "By reason of the general layout of the courtroom, including the jury box and counsel tables, it is obvious that counsel could see activity which could not be seen by jurors. The counsel table for defendant is situated so that counsel look directly at the door through which the prisoner enters the courtroom. The jurors face another direction." 65 Berks County L.J. at 109.

There was a real possibility that an attempt would be made to free appellant. Reasonable precautions were necessary to protect against such a possibility and to guard appellant. In the circumstances of this case, that officers, not in uniform and not visibly armed, stood momentarily next to appellant on this single occasion (assuming the jury witnessed the event), does not constitute reversible error.

Lastly,[16] appellant contends that, assuming no single assignment of error compels a new trial, the asserted

---

[16] Appellant raises three other assignments of error, which, after a review of the record, we conclude are meritless.

First, it is urged that the pretrial denial of appellant's blanket request for all statements of all witnesses interviewed by the Commonwealth in connection with both Eckert's death and the August 12 beating of the three young men, is unconstitutional. Pa. R. Crim. P. 310. Appellant, however, does not claim that the Commonwealth withheld any exculpatory material from him or

errors collectively require reversal. Having concluded that each of appellant's claims is without merit, we likewise reject this final ground for reversal. "Although a perfectly conducted trial is indeed the ideal objective of our judicial process, the defendant is not necessarily entitled to relief simply because of some imperfections in the trial, so long as he has been accorded a fair trial. 'A defendant is entitled to a fair trial but not a perfect one.'" *Commonwealth v. Hill,* 450 Pa. 477, 480-81, 301

---

that it failed to provide him with any material necessary for the defense of his case. As well he could not, for the court en banc noted, "At trial, defense counsel were given statements of all Commonwealth witnesses, where statements were in existence, to aid in cross-examination." *Commonwealth v. Martinolich,* 65 Berks County L.J. 99, 110 (Pa. C.P. 1973).

Second, appellant asserts that he was denied due process because the trial court held a night session on the ninth day of trial during the presentation of his case. On the first day of trial, the judge made clear his intention to hold night sessions, if and when they became necessary. No objection was made then, and it is very unclear whether the defense in fact objected to the trial court's actual declaration of the night session. In any event, it is difficult to perceive how appellant with his prepared defense was prejudiced by a single night session. The conduct of trial is within the sound discretion of the trial court, and here there was no abuse of that discretion.

Third, reversible error allegedly was committed when the prosecution called as a witness Charles Eckert, the victim's father. According to appellant, Mr. Eckert was so emotionally upset that the jury became incurably prejudiced against appellant. However, Mr. Eckert was called for the essential purpose of testifying that the car found in Leesport was the one Glenn had been driving on the night of August 12 and that the sum of money found in the car was the exact amount of receipts from Mr. Eckert's store for that day. After the defense stipulated to these facts, the Commonwealth immediately agreed to excuse Mr. Eckert. The record fully supports the conclusion reached by the court en banc. "We are also completely satisfied that the witness was not called to produce the sympathy of the jurors, but as a necessary link in the prosecution's chain of evidence." 65 Berks County L.J. at 111.

A.2d 587, 590 (1973) (quoting *Lutwak v. United States*, 344 U.S. 604, 619, 73 S. Ct. 481, 490 (1953)).[17]

Our review of the record satisfies us that Judge, then President Judge, Hess properly exercised his judicial responsibility and that appellant was afforded a fair and just trial. By explanation, admonition, and instruction during the course of trial and in his charge, the trial judge kept from the jury's consideration irrelevant issues, impermissible comments, and appeals to prejudice. See ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge § 5.6(b) (Approved Draft, 1972). Yet, his conduct of the trial gave the jury the required latitude to decide appellant's guilt or innocence solely on the evidence properly before it.

Judgment of sentence affirmed.

Mr. Justice NIX concurs in the result.

---

[17] See *Schneble v. Florida*, 405 U.S. 427, 432, 92 S. Ct. 1056, 1060 (1972); *Bruton v. United States*, 391 U.S. 123, 135, 88 S. Ct. 1620, 1627 (1968).