337 A.2d 860

**COMMONWEALTH of Pennsylvania**

**v.**

**Laverne DOUGLAS, a/k/a Vernon Douglas,**

**Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued April 8, 1975.

Decided May 13, 1975.

750

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Abraham J. Gafni, Deputy Dist. Atty., for Law, Maxine J. Stotland, Asst. Dist. Atty., Philadelphia, for appellee.

F. Ross Crumlish, Joseph M. Smith, Philadelphia, for appellant.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

NIX, Justice.

Appellant was charged with the murder of a seventeen-year-old youth, Raymond Clairborne. After trial before a judge and jury, Mr. Douglas was convicted of murder in the second degree and conspiracy. Post-trial motions were denied and a sentence of 10 to 20 years im-

prisonment was imposed under the murder indictment.[1] This direct appeal followed.[2]

Appellant initially charges that the trial court erroneously denied his motion to quash the indictment. This motion was based on alleged pre-trial publicity which appellant contended made it impossible for him to receive a fair and impartial trial. To support this claim, two newspaper articles published at the time of his arrest approximately 11 months prior to trial were made part of the record. There is no evidence of any other news coverage other than these two exhibits. The articles in question in essence indicated the fact of Mr. Douglas' arrest for the crime in question and also referred to the fact that at the time of the alleged commission, he was on bail awaiting trial on another homicide charge. The articles also indicated that the information was derived from the police department.

■■ The accepted procedure, wherein an accused claims to have been prejudiced by an inordinate dissemination of pre-trial publicity pertaining to the crime charged, is either by a motion requesting a change of venue or in the alternative, a request for a continuance. See *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Commonwealth v. Powell*, 459 Pa. 253, 328 A.2d 507 (1974); *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680 (1974); *Commonwealth v. Yount*, 455 Pa. 303, 314 A.2d 242 (1974); *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A.2d 58 (1971); *Commonwealth v. Swanson*, 432 Pa.

1. This sentence was made to run concurrently with the life sentence that appellant was then serving under another unrelated conviction.

2. This Court accepted certification of the appeal from the conviction under the conspiracy indictment from the Superior Court and consolidated the matters for argument and disposition.

293, 248 A.2d 12 (1968), cert. denied, 394 U.S. 949, 89 S.Ct. 1287, 22 L.Ed.2d 483 (1969); see also ABA Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.2 (Approved Draft, 1968). The thrust of appellant's argument is not that the alleged adverse publicity permeated the indictment process and thus resulted in the return of a true or approved bill improperly, but rather that the publicity infected the trial and thereby denied him due process. It is therefore apparent that the relief sought, i. e., a motion to quash the indictment, was in no way related to the injury claimed. This Court has been, and is, steadfast in our denunciation of prejudicial and inflammatory news coverage which inundates a community and deprives one charged with crime the opportunity of a fair trial. To our knowledge, no jurisdiction or respected legal authority has ever advocated quashing the indictment as a remedy if, in fact, this type of wrong has been found to exist. The obvious remedies to be employed to rectify such a condition are either to permit the accused to be tried in an area which is free from the effects of the adverse publicity or to postpone the date of trial until the effects of the publicity have been sufficiently dissipated to allow for a fair and impartial trial.

The trial court was not only correct in denying the motion on the grounds that it was an inappropriate request, but also because it was completely without merit. There is not a scintilla of evidence on this record that supports the claim of appellant that he was denied a fair trial because of adverse pre-trial publicity. Here, as stated, there were only two articles published approximately 11 months prior to the commencement of the trial. See, *Commonwealth v. Hoss, supra; Commonwealth v. Swanson, supra; Commonwealth v. Lopinson,* 427 Pa. 284, 234 A.2d 552 (1967). Further, the reporting was factual, the contents were not unduly inflammatory and the veniremen were carefully questioned to

eliminate any possibility that their judgment would be influenced by information received through media coverage.

The next assignment of error is that the trial judge, in addressing the panel of prospective jurors and during the charge, improperly suggested the guilt of the appellant. Reading the challenged language in context, we fail to perceive any basis for suggesting the inference appellant argues the jurors may have drawn. At the commencement of the jury selection process, the court, in a preliminary statement, observed:

> "THE COURT: Ladies and gentlemen of the jury panel, this defendant, as the indictment was read to you, is charged with Murder in which it is alleged that he is one of four persons all being charged with participating in some way in the stabbing of a person whose name was Raymond Clairborne at the intersection of Glenwood Avenue and Berks Street on March 9th, 1973. Four persons have been charged with that. It has been the experience of lawyers that there are some people who feel that it should be an eye for an eye and a tooth for a tooth and only one person should be charged and not two or four, even though two or four or more may have participated to some degree or may have been there in some capacity.

> Now, do any of you have any mental reservations because each defendant is tried separately and most likely you will not know of the participation of some of the others—maybe you will and maybe you will not, depending on the evidence that is necessary and will be produced at this trial. Do any of you have any mental reservations that you could not find—if the case is proved beyond a reasonable doubt by the Commonwealth—with sufficient evidence—do you feel that you could not find more than one person guilty in the murder of a person, or could you give a fair trial and de-

termine whether this defendant is guilty or not guilty without having mental reservations as to the number of persons that might be convicted for First Degree Murder. Do any of you have limitations on your feelings to that effect?"

When objection was made to these remarks, the court, in an effort to avoid any possibility of a misunderstanding on the part of the veniremen, further stated:

"THE COURT: Ladies and gentlemen of the jury panel, in the event I have given any incorrect impression to any of you, this defendant is on trial—himself. There will be nobody else tried at the same time with him. As a matter of fact, I think I stated that there were four persons said to be involved. You may have gotten the impression that four persons were charged with the same thing he has—two people have, he and another, but each case is an individual separate case which must be considered separately, just as this is."

Although we do not believe the original statement was in any way erroneous or prejudicial, any conceivable misconception was obviously cured by the subsequent statement.

■ Equally devoid of merit is appellant's challenge to the court's statement in the charge. After defining the elements of the offense of conspiracy, the court then stated:

"In this case, the conspiracy referred to, of course, would be if you believed the Commonwealth's evidence and the witness who testified that there were four persons surrounding this victim, Raymond Clairborne, and two of them have been apprehended, two have not and one was—two were holding his jacket at the time that Raymond Clairborne is said to have been stabbed in the back. Under those circumstances, you can either determine that that was a conspiracy or that it was not a conspiracy to do an unlawful act, which

would be the stabbing of Raymond Clairborne. That's a matter for the jury to determine."

Appellant argues that the evidence was conflicting as to the number of people who surrounded the decedent at the time of the alleged crime and therefore this statement represented a material misstatement of the evidence justifying reversal of the judgment of sentence. *Commonwealth v. Crawford*, 452 Pa. 326, 305 A.2d 893 (1973). A review of the record refutes the assertion that these remarks amount to a material misstatement. Three of the eyewitnesses produced by the Commonwealth testified that there were "four or five" boys surrounding the decedent at the time; a fourth eyewitness testified that there were five and one stated that there were four. Whether there were four or five individuals was totally immaterial to the legal concept the court was attempting to convey to the jury at that juncture. The issue then under consideration was whether the appellant was one of the group and whether the members of that group were acting in concert.

The last objection centers around the admission into evidence of a statement made by the victim to his mother shortly before he expired accusing appellant as the person who inflicted the fatal wounds. This testimony was admitted into evidence under the dying declaration exception to the hearsay rule. In discussing this exception, we recently stated in *Commonwealth v. Smith*, 454 Pa. 515, 314 A.2d 224 (1973):

"The reliability of a dying declaration is provided not by an oath, nor by cross-examination; rather, its admissibility is based on the premise that no one 'who is immediately going into the presence of his Maker will do so with a lie upon his lips.' *Lush, L. J., Regina v. Osman*, 15 Cox C.C. 1, 3 (Eng.1881). Consistent with that premise, we have stated that: '. . . before declarations of a deceased may be admitted as dying declarations, the evidence must, inter alia, justi-

fy the conclusion that at the time the statements were made, the declarant believed he was in fact dying, and also that death was imminent. In other words, the admissibility of such evidence depends primarily upon the state of the declarant's mind. *Commonwealth v. Knable,* 369 Pa. 171, 85 A.2d 114 (1952); *Commonwealth v. Lockett,* 291 Pa. 319, 139 A. 836 (1927); and *Commonwealth v. DeLeo,* 242 Pa. 510, 89 A. 584 (1914). However, the required sense of imminent death may be inferred from the existing circumstances including the nature of the wound and state of the declarant's illness. *Commonwealth v. Edwards,* 431 Pa. 44, 244 A.2d 683 (1968), and *Commonwealth v. Plubell,* 367 Pa. 452, 80 A.2d 825 (1951).' *Commonwealth v. Speller,* 445 Pa. 32, 34–35, 282 A.2d 26 (1971)." *Id.* at 517–518, 314 A.2d at 225.

Here, the victim knew that he had received two stab wounds in the back and was bleeding profusely. Upon staggering into his home, he collapsed on the living room floor and exclaimed, "Momma, the knife is still in my back." He also stated, "Momma, I can't breathe", and pleaded with her to remove the knife from the wound. Within an hour after making the challenged statement, the victim was dead. It is evident that the foregoing circumstances surrounding the utterances justified the trial court in a finding that the declarant was aware that death was imminent.

■ Preliminarily, appellant argues that the concept of a dying declaration is predicated upon a vestige of the past and is without meaning in our modern society. He would have us conclude that the sophistication of mankind today is such that the knowledge of impending death no longer engenders apprehension of the unknown and fails to deter falsehood and is incapable of inspiring truth. With this novel proposition we cannot agree. While many things have changed in our country and throughout the centuries, one constant force has been

man's awe and apprehension of death. This Court has recently reaffirmed this exception in our cases in *Commonwealth v. Smith, supra; Commonwealth v. Hawkins,* 448 Pa. 206, 216–217, 292 A.2d 302 (1972); *Commonwealth v. Speller,* 445 Pa. 32, 34, 282 A.2d 26 (1971). The feelings engendered in the souls of men faced with the phenomenon of death have not changed from those expressed so beautifully and poignantly by William Shakespeare in his famous soliloquy in the play "Hamlet."[3]

 Next, it is contended by the appellant that the evidence reflected inconsistent statements by the mother relating to the alleged dying declaration. This argument is premised from the fact that when the mother was first told that her son had expired and was asked by the police official whether or not he had told her who had stabbed him, she is alleged to have answered "No." Even assuming that inconsistent evidence appears on the record, this does not provide a basis for excluding one of the alleged inconsistent statements. It is obviously within the province of the jury to reconcile the inconsistencies, if possible and where not possible, to ascertain where the truth lies.[4] *Commonwealth v. Zapata,* 447 Pa. 322, 326, 290 A. 2d 114, 117 (1972); *Commonwealth v. Ewing,* 439 Pa. 88, 93, 264 A.2d 661, 663 (1970).

██ Lastly, in this context, appellant argues that in addition to the dying declaration, Mrs. Clairborne's testi-

---

**3** *Hamlet, Act III, Scene 1.*

**4.** A reading of the record clearly explains how the alleged inconsistency occurred. Mrs. Clairborne was interviewed by the detective within minutes of her son's death. The testimony showed that at this point she was bordering on hysteria. It was during this time that she is alleged to have said that her son told her who had stabbed him. Thereafter, however, she explained that although her son had indicated the nickname of the person who stabbed him, in the excitement she had forgotten until another young man, who was also a witness to the event, repeated the nickname which caused her to recall the statement made by her dying son.

mony contained prejudicial hearsay which requires the reversal of the judgment of sentence. During cross-examination of Mrs. Clairborne, defense counsel attempted to establish that Mrs. Clairborne had indicated to the detective that her son had not given her the name of his assailant. This line of questioning was obviously an attempt to offset the effect of the dying declaration which she recounted during her testimony in chief. The following colloquy sets forth those statements which form the basis of this complaint:

"By Mr. Crumlish [defense attorney] :

Q. The detective recorded "Question: Did your son Raymond tell you who stabbed him?" And he recorded: "Answer: No but Michael did." You're saying that that detective did not put down the answer—

A. I said Michael had said the name that Raymond had said but at the time I had forgotten the name and so when he said the name and recalled it, then I remembered that was the same name and Michael wasn't the only one saying it because a lot of them said it.

Mr. Crumlish: I object to that, your Honor. That is clearly prejudicial and grounds for mistrial."

The court properly granted motion to strike the hearsay testimony but refused the motion for a mistrial. The court also instructed the jury to disregard this testimony and not to consider it in reaching their verdict. In view of the fact that this information was elicited by questions of defense counsel and the court's curative instructions, we do not believe that there was an abuse of discretion in denying the motion of a mistrial.

Judgment of sentence affirmed.

JONES, C. J., took no part in the consideration or decision of this case.