413 A.2d 1066

**COMMONWEALTH of Pennsylvania**

v.

**Stuart Richard COHEN, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 11, 1979.

Decided April 30, 1980.

168

Emmanuel H. Dimitriou, Reading, Isaac N. Groner, Walter H. Fleischer, Robert S. Steinbaum, Madeline Nesse, Washington, D. C., for appellant.

J. Michael Morrissey, Dist. Atty., Charles M. Guthrie, Jr., Asst. Dist. Atty., Ross Weiss, Berks County, Sp. Asst. Atty. Gen., Montgomery County, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN and FLAHERTY, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

"No right is more fundamental to the American system of justice" than the constitutionally-guaranteed right of an accused to trial by an impartial jury. *Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 504, 387 A.2d 425, 435 (1978), appeal dismissed, 443 U.S. 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979). See U.S.Const. Amends. VI & XIV; Pa.Const. art. I, § 9. At issue on these appeals is whether pre-trial publicity in Berks County denied appellant Stuart Richard Cohen this fundamental right. Unlike the Court of Common Pleas of Berks County, we conclude that the pre-trial publicity did prevent appellant from selecting an impartial jury. Accordingly, we vacate the judgments of sentence and remand for a new trial with a change of venue.

### I.  Procedural History

On November 14, 1974, a man walking along a fire trail in Reading's Egelman Park discovered the body of Steven Warunek, a sixteen year-old Reading youth. Warunek had been shot to death. On November 18, police arrested three eighteen year-old suspects, Anthony Reynolds, George Arms, and appellant, and charged all three with murder. Police also charged appellant with conspiracy to commit murder. Police investigation revealed that appellant hired the other two to kill Warunek in retaliation for threats Warunek made on appellant's life. Warunek allegedly told his fiance, Kerry Young, he would kill appellant, Young's former boyfriend.

The three suspects were committed to the Berks County prison in lieu of $250,000 bail. Soon after arrest, appellant

was released when his father posted certificates of deposit and a bank account with the district justice. Neither Arms nor Reynolds, however, was able to post the necessary security and both remained in prison.

At the same time appellant sought a reduction of bail. In mid-December, at the hearing on appellant's request, Assistant District Attorney Murphy objected on the ground that "Mr. Cohen is accused of premeditated contract killing, and there is a distinct possibility that the district attorney's office will be requesting the death penalty in this case. . . ."[1] Appellant's request for a reduction of bail was denied.

A preliminary hearing on the charges against appellant was held late in January, 1975. Testifying against appellant was Jack Geisler, a "witness" to the killing who, in "sobbing" testimony, both admitted his own involvement and claimed appellant had hired Arms and Reynolds to kill the victim. After two days of testimony, appellant was held for action by the grand jury. On March 5, appellant moved to stay grand jury action against him on the ground that he was prejudiced by media publicity concerning recently-charged Jack Geisler.[2] Judge Edenharter, presiding judge in appellant's case, denied appellant's request. The next day the grand jury indicted appellant and later that month

1. Bail Reduction Transcript at 3.

2. Geisler was not charged until February 24, approximately one month after appellant's preliminary hearing. Shortly after the Commonwealth charged Geisler, the district justice, at the request of the District Attorney's office, reduced Geisler's bail and then released Geisler on his own recognizance. President Judge Eshelman rescinded Geisler's release almost immediately and ordered Geisler back to prison. In only four days, the incident prompted six lengthy articles in the Reading press and ten radio broadcasts. See Venue Exhibit 18 at 622 (Reading Eagle, 3/2/75); id. at 623 (Eagle, 3/3/75); id. at 624 (Times, 3/3/75); id. at 626–27 (Times, 3/4/75); id. at 628 (Times, 3/4/75); id. at 629 (Eagle, 3/4/75); Venue Exh. 20 at 669 (Station WRAW, 3/2/75); id. (WRAW, 3/3/75); id. at 670 (WRAW, 3/4/75); id. (WRAW, 3/5/75); Venue Exh. 21 at 698 (WEEU, 3/2/75); id. at 699 (WEEU, 3/3/75); id. at 700 (WEEU, 3/4/75); id. at 701 (WEEU, 3/4/75); id. at 702 (WEEU, 3/4/75); id. at 703 (WEEU, 3/4/75); id. at 704 (WEEU, 3/5/75).

appellant entered a plea of not guilty. Trial was set for April 14.

On April 7, appellant filed a number of pre-trial applications, including an application to disqualify the District Attorney and his staff and one for a change of venue. The court continued the trial date and on April 28 began a hearing on the application to disqualify the District Attorney and his staff.[3]

Appellant based his motion to disqualify on the ground that the District Attorney and his staff were behaving like "persecutors and not prosecutors." City Detective John Halstead testified that during periods of interrogation either District Attorney VanHoove or Assistant District Attorney Murphy threatened Commonwealth witness Jack Geisler as well as appellant's co-defendant Reynolds that they would "burn" or would have the opportunity to smell "burning flesh" if they did not provide details of the killing. Police Lieutenant Thomas Hess testified that District Attorney VanHoove expressed his desire to stand beside appellant when the "switch was pulled."

■ The trial court denied the application to disqualify and from May 1 to May 9 held a hearing on appellant's application for a change of venue. At the hearing, appellant presented copies of Berks County newspaper articles and transcripts of local radio broadcasts which discussed appellant's case.[4] Appellant also presented Dr. Jay Schulman, a professor at Columbia University and member of the National Jury Project, who is an expert on the impact of publicized criminal proceedings on public opinion.[5] Dr.

---

**3.** On the first day of hearings, the court permitted media representatives to remain in the courtroom but ordered the media not to publish testimony until further order of court. The next day, the court rescinded this order, deeming the hearings fully opened as of inception and thus lifting any restriction on publication.

**4.** Reading has no local television station.

**5.** Dr. Schulman has participated in, consulted in, or researched jury selection in over fifty criminal and civil proceedings, including the "Harrisburg 7" case, *United States v. Ellsberg, United States v.*

Schulman testified on the results of a public opinion poll he conducted which tested Berks County residents' views on appellant's guilt. Dr. Schulman, four other expert witnesses, and six lay witnesses all expressed an opinion that appellant could not receive a fair trial in Berks County. The Commonwealth opposed the application for a change of venue, but offered no evidence. The court denied appellant's application without opinion or other explanation of record.

Appellant then petitioned this Court for a writ of prohibition or mandamus, "direct[ing] a change of venue . . . , or in the alternative, prohibit[ing] the enforcement of the order denying the change of venue." [6] Simultaneously, appellant requested the court to continue trial. It did so, setting a tentative trial date of July 14, 1975. This Court denied appellant's application for extraordinary relief on July 2. Appellant then applied for and obtained another continuance, the court setting trial for the September, 1975 Term.

On September 2, 1975, before the scheduled date of trial, appellant filed a "Re-Application For Change of Venue." In support of his "Re-Application," appellant presented the results of a second public opinion survey. This survey was conducted on August 22 and 23 by Dr. Robert Buckhout,

*Mitchell and Stans*, the "Wounded Knee" cases, the "Attica" cases, and the Joan Little case.

We note there is nothing in either our case law or the commentary which would suggest that exhibits of newspaper articles and other media broadcasts are the exclusive evidence in support of an application for change of venue. To the contrary, the ABA Standards on Fair Trial and Free Press encourage use of opinion surveys. Standard 8–3.3(b) of the Standards (2d ed. Approved Draft, 1978) expressly provides:

"In addition to the testimony or affidavits of individuals in the community, which shall not be required as a condition to the granting of a motion for change of venue . . . , qualified public opinion surveys shall be admissible as well as other materials having probative value."

See id., Commentary at p. 18 ("trial courts should be very liberal in the types of testimony and evidence they will consider").

**6.** Petition for Writ of Prohibition or Mandamus, *Commonwealth ex rel. Cohen v. Judge Edenharter*, No. 431 Misc. Docket 20, at 5.

another member of the National Jury Project. Once again, the Commonwealth, opposing the motion, presented no contrary evidence. The court denied appellant's "Re-Application," again without explanation. Appellant immediately applied for and was denied another continuance. Trial was set for September 8.

Voir dire began Monday, September 8 and lasted two full weeks, through Friday, September 19. In all, 180 persons were called in order to select a twelve-member jury and two alternates. The court ordered each juror immediately sequestered upon selection. At the close of voir dire, appellant for the third time requested a change of venue. The trial court denied this request, again without explanation. Trial began the following Monday, September 22.

At trial, the Commonwealth proceeded on its theory that appellant hired Arms and Reynolds to kill the victim Warunek, presenting testimony not only of Jack Geisler and Anthony Reynolds but also of appellant's former girlfriend Kerry Young. In defense, appellant admitted that he spoke with Arms and Reynolds and produced $700 cash as payment. He maintained, however, that he wanted only Warunek to be "scared" and "shoved around" so that Warunek would know people were protecting appellant. Appellant sought to discredit Commonwealth witness Jack Geisler by showing on cross-examination that Geisler had given police and the District Attorney inconsistent statements and that he had previously testified at appellant's preliminary hearing that appellant wanted only to have Warunek "messed up." Appellant also pointed out that, as of appellant's trial, neither Geisler nor Reynolds had been sentenced on their convictions following their earlier guilty pleas.

The case went to the jury on Wednesday, October 1. That Friday, October 3, the jury returned verdicts of guilty of murder of the third degree and conspiracy to commit murder. Appellant then filed written post-verdict motions for a new trial and in arrest of judgment, which included appellant's claim that the trial court erred in denying a change of venue.

While appellant's motions were pending, Judge Bertolet, presiding judge at co-defendant Arm's separate trial, granted Arms's motion for a change of venue. In support of his motion for a new trial, appellant relied in part upon Judge Bertolet's ruling in the Arms case.[7]

Judge Edenharter, however, denied all of appellant's post-verdict motions. In his accompanying opinion, Judge Edenharter for the first time sought to explain his orders denying appellant's three pre-trial applications for a change of venue. The court summarily dismissed appellant's principal contention that the pre-trial publicity was "inherently prejudicial," concluding that, unlike the Arms case, there is insufficient evidence that any inflammatory information was widely disseminated at the time of trial. The court also concluded that the jury appellant did select was not affected by the pre-trial publicity.

On July 15, 1977, the court imposed sentence of ten to twenty years imprisonment, costs, and a fine of $15,000 on the murder conviction, as well as a concurrent sentence of five to ten years, costs, and a fine of $10,000 on the conspiracy conviction. These appeals followed.[8]

7. In his order of March 22, 1976 granting Arms a change of venue, Judge Bertolet stated that a fair and impartial trial cannot be had in Berks County because of the "massive publicity to date and expected to continue to the time of trial." Judge Bertolet based his determination on newspaper articles offered by appellant and did not rely upon Arms's offer of a public opinion survey Dr. Schulman conducted in connection with the Arms case. We note that this survey, conducted in November of 1975, revealed that 40% of those Berks County residents surveyed could identify Arms, while 79% could identify appellant.

8. Upon sentencing, the court denied appellant bail pending appeal. Appellant then took a direct appeal to this Court from the judgment imposed on the murder conviction and a separate appeal to the Superior Court from the judgment imposed on the conspiracy conviction. Appellant also immediately petitioned this Court for Supersedeas and Allowance of Bail pending appeal. Then-new District Attorney of Berks County Morrissey "consented" to the petition filed with this Court. On July 15, two members of this Court entered an order reinstating bail in the amount of $250,00 "pending the appeal in this Court." On July 21, 1977, the Superior Court certified appellant's appeal from the judgment on the conspiracy conviction to this Court.

## II. Discharge Not Appropriate

Before considering whether a motion for a change of venue should have been granted, we must first consider appellant's contention that, in light of improper conduct on the part of the prosecution, appellant must now be discharged. Appellant makes three arguments in support of this relief. First, he contends the prosecution "coerced" certain Commonwealth witnesses with threats of the electric chair and promises of leniency and that without the "coerced" testimony the evidence is insufficient to support the jury's verdicts. Second, he contends that the many acts of misconduct on the part of the prosecution, including the alleged coercion of certain witnesses, interference with defense access to Commonwealth witnesses, and unfair argument and cross-examination at trial, so denied appellant due process that a discharge is warranted. Third, appellant contends that, under *Commonwealth v. Potter*, 478 Pa. 251, 386 A.2d 918 (1978), appellant must now be discharged for

This Court originally heard argument on these appeals in May of 1979. Appellant claimed trial error, including improper venue, as well as prosecutorial misconduct on the part of previous District Attorney VanHoove and his staff requiring discharge. Then-District Attorney Morrissey not only agreed with appellant that a new trial should be granted but also agreed that the previous district attorney's conduct requires discharge. After argument, at the request of President Judge Eshelman of Berks County, Attorney General Biester reviewed the matter and determined the Attorney General should supersede District Attorney Morrissey to ensure the interests of the Commonwealth are adequately protected. In June of 1979, District Attorney Morrissey petitioned this Court for review of the Attorney General's supersession. The Attorney General was granted a stay of consideration. Also granted were the District Attorney's request for a rule to show cause and the Attorney General's request for oral argument. This Court heard argument on supersession in September of 1979. At argument, the Attorney General agreed to an order vacating supersession but permitting the Attorney General leave to file an amicus brief and orally to argue on the Commonwealth's behalf. This Court then heard reargument on the entire matter in December of 1979. Appellant maintained his previous position, as did District Attorney Morrissey. The Attorney General, as amicus, urges there is neither trial error nor prosecutorial misconduct requiring discharge and thus contends that judgments of sentence should be affirmed.

what appellant has termed the prosecution's "overwhelming display" of "bad faith." We reject all three arguments.

We cannot agree that there is insufficient evidence to support the jury's verdicts. Corroborated testimony of Commonwealth witnesses supports a jury's conclusion that appellant hired Arms and Reynolds to kill the victim. Although appellant invites this Court in evaluating the sufficiency of the evidence not to consider testimony of Commonwealth witnesses allegedly coerced by the District Attorney, we must decline the invitation. It is not the practice of this Court to "diminish the record" before reviewing the sufficiency of the evidence. "[T]he sufficiency of the evidence must be evaluated upon the *entire trial record." Commonwealth v. Tabb,* 417 Pa. 13, 16, 207 A.2d 884, 886 (1965). Accord, *Commonwealth v. Kuebler,* 484 Pa. 358, 361 n.*, 399 A.2d 116, 117 n.* (1979); *Commonwealth v. Meadows,* 471 Pa. 201, 369 A.2d 1266 (1977).

Nor can we agree with appellant that the alleged prosecutional misconduct here forecloses retrial on a theory that due process has been denied. We cannot accept appellant's claim that a new trial is not a sufficient remedy for the asserted prosecutorial misconduct. Appellant's claim mistakenly rests on an unsupportable assumption that a fair trial cannot be had in the future. Finally, we cannot agree with appellant that *Potter* requires discharge here. *Potter* is a case where prosecutorial misconduct allegedly forced the defendant to request a mistrial. No such circumstance is present here. Appellant points to nothing on this record establishing that he made any timely request for a mistrial.

### III. Record Mandates Change of Venue

"Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California,* 314 U.S. 252, 271, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941). Accordingly, a trial court has an affirmative constitutional obligation to take "strong measures" to assure a fair trial. *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). As

our cases repeatedly state, a trial court requested to change venue must exercise a "sound" discretion. *Commonwealth v. Casper*, 481 Pa. 143, 150, 392 A.2d 287, 291 (1978).[9]

■ In exercising sound discretion, the trial court is to consider the following "discrete factors:"

"whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational, inflammatory and 'slanted articles demanding conviction,' *United States v. Sawyers*, 423 F.2d 1335, 1343 (4th Cir. 1970); whether the pre-trial publicity revealed the existence of the accused's prior criminal record; whether it referred to confessions, admissions or reenactments of the crime by the defendant; and whether such information is the product of reports by the police and prosecutorial officers."

*Commonwealth v. Casper*, supra, 481 Pa. at 152–53, 392 A.2d at 292 (footnotes omitted). So too, the extent of saturation as well as the possibility that a period of "cooling-off" has occurred must be considered. Id., 481 Pa. at 153–54, 392 A.2d at 292–93. It must also be remembered that

"[A] motion for change of venue . . . shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a substantial likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or in the court's own evaluation of the nature, frequency, and timing of the material involved. A showing of actual prejudice shall not be required."

ABA Standards Relating to Fair Trial and Free Press, supra, at Std. 8–3.3(c) (2d ed. Approved Draft, 1978).

---

**9.** Accord, *Commonwealth v. Richardson*, 476 Pa. 571, 586, 383 A.2d 510, 518 (1978); *Commonwealth v. Hoss*, 469 Pa. 195, 199, 364 A.2d 1335, 1337 (1976) (*Hoss II*); *Commonwealth v. Kichline*, 468 Pa. 265, 273, 361 A.2d 282, 287 (1976); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 52, 337 A.2d 873, 877 (1975); *Commonwealth v. Powell*, 459 Pa. 253, 259, 328 A.2d 507, 510 (1974); *Commonwealth v. Martinolich*, 456 Pa. 136, 141, 318 A.2d 680, 683 (1974); *Commonwealth v. Swanson*, 432 Pa. 293, 299, 248 A.2d 12, 15 (1968).

■ Moreover, a reviewing court must not simply defer to a trial court's order denying a change of venue. Rather, a reviewing court must very carefully scrutinize such an order to ensure that a sound discretion has been exercised. As the Supreme Court of the United States has made clear, where, as here, the accused's ability to obtain a trial by an impartial jury is called into question, "appellate tribunals have the duty to make an independent evaluation of the circumstances." *Sheppard v. Maxwell*, supra, 384 U.S. at 362, 86 S.Ct. at 1522. See *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973). Here, our review of the record and independent evaluation of the circumstances convince us that prejudicial material was widely disseminated at the time of trial and thus a change of venue is necessary.

### A. Dissemination of Prejudicial Material

■ From appellant's arrest in mid-November, 1974 until hearings in May of 1975 on appellant's first application for a change of venue, Reading's two newspapers the "Times" and the "Eagle," [10] as well as Reading radio stations WRAW and WEEU, extensively covered every aspect of this case. The record contains thirty-seven newspaper articles, including sixteen front-page stories, and thirty-eight radio broadcasts which directly feature aspects of this case.

Most extensively publicized is the allegation of a "contract killing." The front page of the December 13 Eagle reported Assistant District Attorney Murphy's disclosure that the Commonwealth "may seek the death penalty which, he said, is allowed for premeditated contract killings." [11] The December 14 Times and radio station WRAW also immediately gave similar coverage.[12] Forty-one subsequent newspaper stories, reporting through the May hearings on appellant's application for a change of venue, carried what became

10. The Times and Eagle have a combined daily circulation of 44,994. The Eagle has a Sunday circulation of 46,860.

11. Venue Exh. 18 at 604.

12. Venue Exh. 18 at 605 (Times, 12/14/74); Venue Exh. 20 at 666 (WRAW, 12/13/74).

standard-reference to the fact that a "contract killing" was involved. These references became so prevalent that subsequent stories referred to the "contract killing" without mentioning that the remarks were made by Assistant District Attorney Murphy at appellant's reduction of bail hearing. One newspaper story even pointed out that "[t]he case is believed to be the first alleged contract killing in Pennsylvania since the Joseph Yablonski murders in 1969." [13]

Also well-publicized were allegations that appellant and the co-conspirators made plans to kill Warunek while "high" on drugs and alcohol. A front-stage story of the January Times 25 entitled "Cohen murder hearing begun," accompanied by a 6½ inch by 6¾ inch photograph of appellant and his attorney, summarizes witnesses' allegations that

> "a conspiracy to 'mess up' the 16-year-old Steve E. Warunek was made during a dope and booze party in an apartment at 111 S. 8th St. when the alleged conspirators were 'high.'" [14]

The same day the Eagle also carried a story entitled "Killing Linked To Lover's Spat." Accompanying this story, like the story in the Times, is a 5 inch by 6 inch photograph of appellant and his attorney. The story beings:

> "The November slaying of 16-year-old Steve E. Warunek in Egelman Park was depicted Friday as a contract murder, carried out amidst fear of reprisal in a heated lovers' triangle with the conspirators discussing plans during smoke-filled pot and alcohol parties." [15]

The January 31 and February 2 Eagle, the February 1 and February 4 Times, and a January 30 WRAW radio broadcast

---

**13.** Venue Exh. 18 at 609 (Eagle, 1/25/75). It is noted that three of the persons charged in connection with the Yablonski "contract killings" were granted a change of venue. See *Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 490, 387 A.2d 425, 428 (1978) (Boyle); *Commonwealth v. Pass*, 468 Pa. 36, 44 n.2, 360 A.2d 167, 170 n.2 (1976) (Pass); id., 468 Pa. at 44, 360 A.2d at 170 (Prater).

**14.** Venue Exh. 18 at 608.

**15.** Id. at 609.

carried similar reports.[16] Additionally, all but one of the same newspaper articles disclosed that appellant and his former girlfriend had a child out-of-wedlock. Cf. *Commonwealth v. Frazier*, 471 Pa. 121, 369 A.2d 1224 (1977) (dissemination of accused's criminal record prejudicial); *Commonwealth v. Pierce*, supra (same).

Equally prominent among the subjects of extensive media publicity is the fact that only appellant of the three originally-arrested suspects had the financial capacity to afford pre-trial release on bail. Immediately upon appellant's release, both the November 19 Times and Eagle as well as news broadcasts of WRAW and WEEU made regular reference to the fact that only appellant was free on bail.[17] Reports on the disparity in the suspects' ability to afford pre-trial release appeared in eighteen subsequent newspaper articles and sixteen radio broadcasts.

In reporting on appellant's pre-trial applications, media attributed to appellant "delays" in the proceedings. The April 9 Eagle, in its front-page story "Court grants delay," reported that Assistant District Attorney Murphy "opposed any continuance, claiming that the pretrial relief could be resolved without too much reasonably [sic] delay. However, Judge Frederick Edenharter overruled the objection." The same story commenting on the "delay" also repeated Murphy's characterization of appellant's "25-page legal document" as "extraordinary and extra-legal." [18] The April 10 Times carried a similar story, entitled "Cohen case delayed a month." [19]

16. Venue Exh. 18 at 611 (Eagle, 1/31/75); id. at 614 (Eagle, 2/2/75); id. at 613 (Times, 2/1/75); id. at 615 (Times, 2/4/75); Venue Exh. 20 at 667 (WRAW, 1/30/75).

17. Venue Exh. 18 at 600 (Eagle, 11/19/74); id. at 601 (Times, 11/19/74); Venue Exh. 20 at 659 (WRAW, 11/18/74); id. at 660 (WRAW, 11/18/74); id. at 661 (WRAW, 11/18/74); Venue Exh. 21 at 682 (WEEU, 11/18/74); id. at 683 (WEEU, 11/18/74); id. at 686 (WEEU, 11/19/74); id. at 687 (WEEU, 11/19/74).

18. Venue Exh. 18 at 640.

19. Id. at 641. See also Venue Exh. 21 at 712 (WEEU, 4/9/75).

Special media attention centered on appellant's pre-trial application to disqualify the District Attorney and his staff.[20] The April 29 Eagle highlighted police testimony concerning District Attorney VanHoove and Assistant District Attorney Murphy:

"City Detective John Halstead testified that either Mr. VanHoove or Mr. Murphy threatened Jack Geisler, 23-year-old suspect in the case, and another defendant, Anthony Reynolds, 18, during the interrogation periods.

During questioning by Atty. Dimitriou, Detective Halstead said that one or the other told the two defendants that 'he would burn' or would have the opportunity to smell burning flesh if they did not provide details in the case.

Lt. Thomas P. Hess was called to testify regarding a statement by Mr. VanHoove allegedly made some time in December 1974 or late January 1975. Through examination by Atty. Dimitriou, Lt. Hess admitted that Mr. VanHoove made a remark to the effect that he wanted to stand beside Mr. Cohen when they pulled the switch.

Lt. Hess explained that the reference to Cohen was made to a room full of people and was an offhand remark. He didn't remember if it was presented in a joking manner but that it was made in the county detective's office of the DA's headquarters." [21]

By his publicized "pull the switch" remark, VanHoove announced his opinion on appellant's guilt in violation of

**20.** The April 28 Eagle carried a story "Press in Closed Hearing" which recited the preliminary order of the court permitting media representatives to remain during the hearings but not permitting the media to publish testimony and evidence until further order of the court. Venue Exh. 18 at 646. See supra note 3. The next day, the April 29 Times carried a front-page story that "Press will fight secrecy—Appeal planned in Cohen case ruling." Venue Exh. 18 at 648. That evening's Eagle, however, carried a story "Cohen Action Opened," reporting both the court's reversal of its previous order not permitting publication until further order of court and the testimony presented at the hearing on appellant's motion to disqualify. Id. at 647.

**21.** Venue Exh. 18 at 647.

*Commonwealth v. Pierce,* supra.[22]   The April 30 *Times* carried front-page stories, one entitled "Cohen hearing opened to public" and one "Defense claims partiality," both of which further detailed testimony at the hearing on appellant's application to disqualify.   The "Cohen hearing opened to public" story summarized Officer Hess's previous testimony, reported in the April 29 *Eagle,* that VanHoove wanted to be standing next to Cohen when the "switch was pulled." The "Defense claims partiality" story mentioned the earlier release of Geisler on his own recognizance at the request of the District Attorney, and again discussed testimony of Detective Halstead concerning the "lurid" statements about the electric chair made by the District Attorney.[23]

Berks County media also gave great attention to appellant's pre-trial application for a change of venue.   The court began to hear testimony on appellant's application on May 1. The May 2 *Times* carried a lengthy story entitled "Court ponders trial site plea" which set forth testimony on the qualifications of appellant's expert witness Dr. Jay Schulman.[24]   The same day's *Eagle* carried another extensive

**22.**   In *Pierce,* this Court relied upon sections 1.1 and 2.1 of the ABA Standards Relating to Fair Trial and Free Press (Approved Draft, 1968), which recommend restrictions on disclosures by prosecuting attorneys and law enforcement officers, to set down the following rule:

"[I]n this Commonwealth policemen and members of the staffs of the office of District Attorneys shall not release to the news media; (a) the existence or contents of any statement or confession given by the accused, or his refusal to give a statement or to take tests; (b) prior criminal records of the accused, including arrests and convictions; (c) any inflammatory statements as to the merits of the case, or the character of the accused; (d) the possibility of a plea of guilty; (e) nor shall the authorities deliberately pose the accused for photographs which connect him with the scene of the crime."

*Pierce,* 451 Pa. at 200, 303 A.2d at 215.   Although nothing would indicate that District Attorney VanHoove's "pull the switch" remark concerning the merits was directly released to the news media, still it must be obvious that, by this tactic, the District Attorney accomplished by indirection what *Pierce* directly proscribes.

**23.**   Venue Exh. 18 at 649–50.

**24.**   Id. at 654.

story entitled "Survey Allowed in Cohen Case," which discussed the court's ruling allowing appellant to introduce Schulman's expert testimony.[25] Both the May 3 Times and Eagle carried related, extensive stories.[26]

Eight more stories appeared between May 5 to May 9, all of which discussed testimony at the hearing on appellant's application for a change of venue, including "Consultant Queried on Survey Errors,"[27] "Jury researcher calls Berks biased,"[28] " 'Prejudice' Is Probed At Hearing,"[29] "Prejudice Is Estimated,"[30] and "4 rule out fairness."[31]

## B. Prejudicial Material Pervasively Disseminated at Time of Trial

The record clearly establishes that the repeatedly-disseminated prejudicial material was widespread throughout Berks County at the time of trial. Thus inapposite are those cases in which the allegedly objectionable reports were not particularly widespread.[32] Equally distinguishable are those cases in which the claimed objectionable reports so long preceded jury selection as to allow for a period of "cooling off."[33]

**25.** Id. at 653.

**26.** Id. at 656.

**27.** Venue Exh. 22 at 719 (Eagle, 5/5/75).

**28.** Id. at 722 (Times, 5/7/75).

**29.** Id. at 723 (Eagle, 5/7/75).

**30.** Id. at 725 (Times, 5/8/75).

**31.** Id. at 726 (Times, 5/9/75).

**32.** See *Commonwealth v. Richardson*, 476 Pa. 571, 586–87, 383 A.2d 510, 518 (1978); *Hoss II*, supra, 469 Pa. at 202, 364 A.2d at 1339; *Commonwealth v. Nahodil*, 462 Pa. 301, 306, 341 A.2d 91, 93 (1975); *Commonwealth v. Hoss*, 445 Pa. 98, 106, 283 A.2d 58, 63 (1971) (*Hoss I*).

**33.** See *Commonwealth v. Casper*, supra, 481 Pa. at 157, 392 A.2d at 294; *Commonwealth v. Richardson*, supra, 476 Pa. at 587, 383 A.2d at 518; *Commonwealth v. Kichline*, 468 Pa. 265, 275–76, 361 A.2d 282, 287 (1976); *Commonwealth v. Pass*, 468 Pa. 36, 44, 260 A.2d 167, 170 (1976); *Commonwealth v. Nahodil*, supra, 462 Pa. at 306,

Here in the months between arrest and trial Berks County residents became increasingly aware of this case. So too an ever-growing number of residents formed an opinion on the merits. The public opinion poll conducted by Dr. Schulman in March and April of 1975 and admitted into evidence at the May hearing on appellant's first application for a change of venue revealed that, of 804 randomly-selected Berks County registered voters, 65% then were aware of the case. Of those polled, 30%, or 242 out of 804 people, expressly conceded they had prejudged appellant guilty. Dr. Buckhout's survey, conducted approximately four months later in late August, revealed a still greater public awareness of this case. Of the 250 people randomly interviewed, 79% were aware of this case, an increase of approximately 15% from the level of awareness found four months earlier. Dr. Buckhout's survey also revealed that 57% of all persons interviewed, or 143 out of 250 people, attributed guilt to appellant.[34] This figure is nearly twice as great as the figure found in the previous poll. These results, unchallenged and undisturbed by the trial court, demonstrate with unquestionable clarity the substantial extent to which pretrial publicity had reached the local population and had influenced its judgment.[35]

Voir dire, conducted in September, about two weeks after Dr. Buckhout's August survey, confirmed the results of Dr.

341 A.2d at 93; *Commonwealth v. Stoltzfus*, 462 Pa. 43, 53, 337 A.2d 873, 877–78 (1975); *Commonwealth v. Douglas*, 461 Pa. 749, 753, 337 A.2d 860, 862 (1975); *Commonwealth v. Dobrelenski*, 460 Pa. 630, 639, 334 A.2d 268, 272 (1975).

**34.** Dr. Buckhout asked persons polled to rate their belief of appellant's guilt on a scale of "zero" to "ten." One hundred forty-three ascribed more than "zero" guilt. One hundred thirty-eight of the 143, or 55% of all persons interviewed, ascribed to appellant guilt of "five" or greater.

**35.** The trial court here in no respect questioned the basic results of the surveys relied upon in text. Instead, the trial court merely questioned Dr. Schulman's estimation based upon the results of the survey that as many as 75% to 80% of Berks County residents prejudged appellant guilty. (Nowhere in its opinion does the trial court in any respect dispute either the evidence or conclusions of Dr. Buckhout.)

Buckhout's poll. Of the 180 prospective jurors called, eleven were excused on various grounds of hardship and not questioned concerning the merits. Of the 169 persons questioned, 105 stated they held an opinion concerning the merits. Indeed, of these 105 prospective jurors, eighty-nine were excused on the ground that they admitted a "fixed," irrevocable opinion on guilt. Thus, 53% of the prospective jurors questioned were excused because of prejudgment.[36]

These percentages of persons expressing an opinion on an accused's guilt are unprecedented in our cases. For example, in *Frazier*, supra, this Court held that widespread pretrial disclosures of the accused's previous convictions as well as police testimony at the preliminary hearing that the accused admitted his own involvement were "inherently prejudicial" and required a change of venue. There a "majority" of eleven of the thirty-two jurors questioned were challenged for cause by the accused. In addition, five prospective jurors, excused by peremptory challenges, had an opinion on guilt. This Court in *Frazier* concluded on the basis of voir dire that "clearly . . . the news coverage which occurred at the time of and shortly after the homicide was still in the minds of the prospective jurors at the time of

---

**36.** An additional five persons were stricken for cause on other grounds of prejudgment. One was prejudiced when told appellant could obtain release on $250,000 bail, two when told a "contract killing" is involved, and two when told appellant is Jewish. Opinion of Edenharter, J., Sur Motion for New Trial and in Arrest of Judgment, at 15 n.13.

We note that the pre-trial publicity also affected the jury selected. It required substantial periods of sequestration. The first three jurors, sequestered immediately upon selection, were sequestered a total of 25 days. Twelve of the fourteen jurors and alternates admitted that to some extent they had read about appellant's case. One of the selected jurors admitted that he had formed an opinion. Despite the fact that a majority of prospective jurors admitted they had fixed opinions which could not be set aside, this juror claimed he could set his opinion aside. Voir Dire Trans. at 584. A second juror, selected September 9 and sequestered the full total of twenty-five days, is a self-employed plumber who admitted that service on the jury would pose a "great financial loss" which would affect his judgment. Voir Dire Trans. at 104. A third juror stated he was familiar with the case by way of discussions among prospective jurors. Voir Dire Trans. at 1107.

trial." *Frazier*, 471 Pa. at 131, 369 A.2d at 1229. Compare *Commonwealth v. Casper*, supra (no inherent prejudice where two out of 42 prospective jurors knew of case and couldn't decide case on basis of evidence at trial); *Commonwealth v. Stoltzfus*, supra (no inherent prejudice where 31 out of 139 prospective jurors questioned formed fixed opinion); *Hoss I*, supra (no inherent prejudice where 26 out of 138 jurors questioned had formed opinion). Surely appellant, whose evidence reveals that as many as nearly two-thirds of those jurors questioned had an opinion on guilt, and indeed 53% of those questioned were excused on the ground of an irrevocable prejudgment of the merits, is entitled to no less protection than that afforded in *Frazier*. It therefore must be concluded that the prejudicial material was widespread at the time of trial and that the court abused its discretion in refusing on this record to grant a change of venue.

So too, this record mandates that retrial must be in another venue. Pursuant to Pa.R.Crim.Proc. 312(a), we change venue from the Court of Common Pleas of Berks County, 23rd Judicial District of the Commonwealth of Pennsylvania to the Court of Common Pleas of Lackawanna County, 45th Judicial District of the Commonwealth of Pennsylvania.[37]

Judgments of sentence vacated and case remanded for proceedings consistent with this opinion.

NIX, J., files an opinion concurring in part and dissenting in part.

NIX, Justice, concurring and dissenting.

I am in substantial agreement with the reasoning of the majority in reaching the conclusion that appellant was not

[37]. Because we conclude that a new trial is necessary, we have no occasion to address any of appellant's following claims: (a) that the trial court should have continued the date of trial from September 8; (b) that prosecutorial misconduct requires a new trial; (c) that the court improperly failed to provide appellant pre-trial statements of Commonwealth witnesses.

188

entitled to be discharged and that further prosecution for these offenses should not be barred. I also share the position that the prevailing climate in Berks County at the time of appellant's trial precluded the possibility that he could receive a trial by an impartial jury. To remedy this error a new trial must be granted. But the decision of the majority, at this time, to also provide for a retrial outside of Berks County is totally unwarranted.

The trial in this case occurred between September 22 and October 3, 1975. To conclude that the climate remains unchanged today, without the least support for such a judgment, cannot be supported.[1] The appropriate resolution would permit the Berks County court to determine, at least in the first instance, whether at this time appellant could be given a fair trial within that county. I, therefore, dissent to that portion of the mandate of this Court directing a change of venue *sua sponte.*

1. The record before us contains only information concerning the climate prevailing in Berks County in 1975. Five years have passed since the trial and without any information concerning the climate today, the majority is ordering a change of venue. Perhaps the climate in 1980 is the same as in 1975, or it is possible that the citizenry's prejudices may be rekindled by a retrial of the appellant. Nonetheless, we have consistently held that "it is blackletter law an appellate court cannot consider anything which is not part of the record in the case," *Saint John the Baptist Greek Catholic Church v. Musko,* 448 Pa. 132, 162, 291 A.2d 89 (1972), and "[o]nly the facts that appear in this record may be considered by the appellate court." *Commonwealth v. Young,* 456 Pa. 102, 115, 317 A.2d 258, 264 (1974). Based upon the record, it is inappropriate and premature for us to conclude that a change of venue is warranted. *See, e. g., Commonwealth v. Douglas,* 461 Pa. 749, 753, 337 A.2d 860, 862 (1975). Moreover, at this juncture we do not know whether appellant still desires a change of venue.