J-S10034-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTY LYNN WILLIS | : | |
| | : | |
| Appellant | : | No. 1169 MDA 2021 |

Appeal from the Judgment of Sentence Entered July 9, 2021
In the Court of Common Pleas of Northumberland County Criminal
Division at No(s): CP-49-CR-0001710-2019

BEFORE: MURRAY, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.: **FILED JULY 06, 2022**

Christy Lynn Willis (Appellant) appeals from the judgments of sentence, following her convictions for obstruction in a child abuse case, hindering apprehension or prosecution, and false reports to law enforcement authorities.[1] She challenges a deferred ruling denying her pre-trial motion for

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 4958(b.1), 5105(a)(5), and 4906(b)(1), respectively.

Appellant also purports to appeal from the orders denying her pre-trial motion for a change of venue and her post-sentence motion. We have corrected the caption to reflect that Appellant's appeal properly lies from the judgments of sentence entered, rather than the orders denying her pre-trial and post-sentence motions. **See Commonwealth v. Dreves**, 839 A.2d 1122, 1125 n.1 (Pa. Super. 2003) (*en banc*) (noting correction of a caption to reflect that a direct appeal was an appeal from an order entering judgments of sentence rather than an order denying a post-sentence motion); **see also Commonwealth v. Swanson**, 225 A.2d 231, 232 (Pa. 1967) (holding that, in general, the defendant in a criminal case can appeal only from the judgment

*(Footnote Continued Next Page)*

a change of venue, the denial of her change of venue claim in her post-sentence motion, and the sufficiency of the evidence sustaining her convictions.  Upon review, we affirm.

The trial court summarizes the factual history of the case as follows:

[Appellant] was charged with one count of Obstruction of a Child Abuse Investigation, one count of Hindering Apprehension or Prosecution, and one count of False Reports to Law Enforcement Authorities.  The charges stemmed from a child abuse investigation.  [Appellant's] son, Jahrid Burgess, was the subject of an investigation of the abuse of his girlfriend's [three-year-old] daughter, [A.P.], which resulted in the child's death.  Allegedly, Mr. Burgess, in a fit of anger, threw his girlfriend's daughter which caused the child to strike her head.  Almost immediately after the child began having seizures[,] Samantha Delcamp, the child's mother, attempted to help her daughter and begged Mr. Burgess to call 911.  Mr. Burgess repeatedly refused to call 911 but did call his mother, [Appellant].  [Appellant] arrived approximately twenty to thirty minutes later.  Eventually, [Appellant] did call 911 after Ms. Delcamp repeatedly requested they do so.

After 911 was called[,] Ms. Delcamp rode with her daughter in the ambulance to Geisinger Medical Center (GMC).  Jahrid Burgess and [Appellant] drove to GMC in [Appellant]'s vehicle.  While at the hospital[,] Ms. Delcamp, Jahrid Burgess[,] and [Appellant] went outside so Mr. Burgess could smoke a cigarette.  It was then Ms. Delcamp first heard [Appellant] state to Mr. Burgess that he should not worry [and] that she would say that she was there so there was another witness.  She also overheard [Appellant] tell Mr. Burgess that she would say she was there the whole time so no one would get in trouble.

Brittany Duke-Williams, a caseworker for Northumberland County Children and Youth Services testified for the Commonwealth at

---

of sentence, and an appeal from any prior order, such as an order denying a change in venue, will be quashed as interlocutory); ***Commonwealth v. Chamberlain***, 658 A.2d 395, 397 (Pa. Super. 1995) (in a criminal action, an appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions).

trial. Ms. Duke-Williams was the on-call caseworker [on] October 10-11, 2019. She responded to a call regarding [A.P.] and went to [GMC]. Ms. Duke-Williams introduced herself to Samantha Delcamp, Jahrid Burgess[,] and [Appellant], and informed them she was there to investigate a report of possible child abuse, but there were no named perpetrators at that time. [Appellant] told Ms. Duke-Williams that Ms. Delcamp was doing dishes, Jahrid Burgess was eating, [A.P.] was at her table and [Appellant] was folding laundry, and that she heard [A.P.] fall and saw her on the floor.

Dr. Paul Bellino testified as to the nature and extent of [A.P.]'s injuries. Dr. Bellino is an expert in pediatric medicine with a specialty in identifying pediatric abuse. Dr. Bellino was asked to evaluate [A.P.] because of a suspicion she was the victim of abuse. Dr. Bellino testified that[,] within a reasonable degree of certainty[,] that her injury was the result of trauma. Indeed, Dr. Bellino indicated that had the medical team known of the trauma upon her arrival at the hospital her treatment would have been sooner and possibly enabled her to survive her injuries.

Pennsylvania State Trooper Jessica Nashke was assigned to the Criminal Investigation Unit on October 11, 2019. As part of her duties, Trooper Nashke took photographs of [A.P.] The Commonwealth introduced three photographs into evidence. Exhibit Number 4 was a photo of [A.P.] sedated in her hospital bed. Exhibit Number 5 was another photo of [A.P.] that was more [of] a full body shot of her in her hospital bed. The last photograph submitted by the Commonwealth was Exhibit Number six, which was another photograph of [A.P.] in her hospital bed. All three of these photographs were admitted into evidence without an objection by [Appellant's] counsel.

The Commonwealth next called Corporal Jeffrey Kowalski[,] who was a Trooper with the Pennsylvania State Police Bureau of Criminal Investigation assigned to the Computer Crime Unit. Counsel for [Appellant] stipulated to Corporal Kowalski testifying as an expert in the forensic investigation of cell phones and computers.

Corporal Adrian Bordner of the Pennsylvania State Police testified that [Appellant] came to the barracks at Stonington while Jahrid Burgess was being questioned. She was looking for information as to what was going on. When asked about what she knew about

the incident[,] she told [C]orporal Bordner that she was at the residence at the time. Corporal Bordner further testified that he later interviewed [Appellant] with Trooper Seibert. During that interview[, Appellant] again stated that she was present in the home when [A.P.] had a seizure, in direct contradiction to Ms. Delcamp's testimony and the forensic evidence recovered from the phones.

Trooper Brian Seibert was the last witness produced by the Commonwealth. Trooper Seibert testified that he was present when [Appellant] initially spoke to Corporal Bordner in the lobby of the State Police Barracks. Trooper Seibert's testimony confirmed Corporal Bordner's testimony about the initial conversation with [Appellant]. Trooper Seibert also testified as to Exhibits 8, 9, 10[,] and 11, which were the records of the data extracted by Corporal Kowalski from the cell phones of Samantha Delcamp and [Appellant]. Trooper Seibert testified that on the date of the incident there was a search on Ms. Delcamp's phone at 8:59 p.m. [for] "[W]hat do you do for a seizure." It was not until 9:47 p.m. that 911 was called from [Appellant's] phone.

Trooper Seibert testified that [Appellant] received a phone call from Ms. Delcamp's phone at 9:31 p.m. This evidence contradicted [Appellant's] statement that she was present in the home when the child had a seizure. Additionally, Trooper Seibert testified that [Appellant's] statement that she was present when her son, Jahrid Burgess was searching on Ms. Delcamp's phone for what to do during a seizure was contradicted by the fact that the phone logs showed that there was a two[-]minute phone call from Ms. Delcamp's phone to [Appellant]. Ultimately, Trooper Seibert testified that [Appellant's] statement [that] she was present at the time [A.P.] had a seizure was not possible given her phone records.

Trial Court Opinion, 11/5/21, 1-5 (references to minor abuse victim changed to initials; reformatted text in brackets; citations omitted; opinion is unpaginated).

Relevant to this appeal, Appellant filed an omnibus pre-trial motion requesting, *inter alia*, a change of venue because of local newspaper coverage

of Appellant and the circumstances of her criminal charges. Omnibus Pre-Trial Motion, 1/27/21, ¶¶ 17-22. The court issued an order noting that the motion for a change of venue would be "reserved for jury selection." Order, 3/4/21, 1; see also Trial Court Opinion, 11/5/21, 5-6 ("[President Judge Charles] Saylor deferred ruling on that motion until the jury selection had begun. If a jury could not be empaneled, he would grant the Motion. Jury selection took place before Judge Paige Rosini and the jury was seated without issue.").

Appellant proceeded to be tried by a jury before the Honorable Hugh A. Jones on April 14-15, 2021. After hearing the evidence summarized above, the jury found Appellant guilty of the above-referenced charges and indicated a finding that Appellant "employed deception upon the reporter, witness or victim or employed such tactics with reckless intent or knowledge upon any other person." Verdict Sheet, 4/15/21, 1 (original in all caps).

The court sentenced Appellant to fourteen months to ten years of imprisonment for obstruction in a child abuse case, to be followed by three months to seven years of imprisonment for hindering apprehension or prosecution, and one year of probation for false reports to law enforcement authorities. Sentencing Orders, 7/9/21. Appellant filed a post-sentence motion, challenging a verbal order denying her pre-trial motion for a change of venue. Post-Sentence Motion, 7/13/21, ¶¶ 5-12. Appellant timely filed a counseled notice of appeal following the denial of her post-sentence motion. Order, 8/2/21, 1; Notice of Appeal, 8/27/21, 1. She thereafter filed a timely

concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Order, 9/1/21, 1; Rule 1925(b) Statement, 9/13/21, 1-2.

Appellant presents the following questions for our review: (1) "Whether the Trial Court erred or abused its discretion in denying the Appellant's Motion of Change of Venue?" and (2) "Whether the evidence was insufficient to sustain the convictions of the Appellant for obstruction, hindering apprehension, and false reports to law enforcement?" Appellant's Brief at 2.

In her first issue, Appellant asserts that the trial court erred or abused its discretion by denying her motions for a change of venue that were included in her omnibus pre-trial motion and her post-sentence motion. Appellant's Brief at 11-14. She claims that she was entitled to a change of venue under Pa.R.Crim.P. 584(A) because of publicity from pre-trial local newspaper coverage that she alleges was "sensational, inflammatory, slanted toward conviction, and saturated the community within a sufficient proximity of time before jury selection." Appellant's Brief at 11-12.

The trial court recommends that this claim is moot because Appellant supposedly withdrew the motion preserving the claim. Trial Court Opinion, 11/5/21, 5-6 ("The Court beliefs [sic] that this matter is moot. Indeed, on a Motion in Limine before this court defense counsel indicated he was withdrawing the Motion. (Motion in Limine, April 13, 2021, pg. 1 lines 13-25)."). Before embarking on our own analysis, we decline to accept the trial court's reasoning as to mootness. While Appellant filed a motion in *limine* on March 5, 2020, that motion did not include a request concerning a change of

venue. Appellant withdrew that motion in *limine* with a praecipe filed on June 16, 2020, and the change of venue was then subsequently raised in an omnibus pre-trial motion. Omnibus Pre-Trial Motion, 1/27/21, ¶¶ 17-22. The certified record does not support the notion that Appellant ever withdrew the pre-trial motion raising the venue claim. An order issued by the court prior to trial separately addressed four sub-parts of the omnibus pre-trial motion and indicated that the motion for a change of venue would be "reserved for jury selection." Order, 3/4/21, 1.

The denial of claims for a change of venue based on pre-trial publicity are reviewed under an abuse of discretion standard, and the nature of the content of the publicity can yield a presumption of prejudice to the defendant that can be negated by a "cooling off period" in between the time of the publicity and the time of trial:

> In Pennsylvania, a trial court must grant a change of venue where a fair … trial cannot otherwise be had in the county where the case is currently pending. Ordinarily, an accused challenging a trial court's failure to grant a motion for a change of venue on the basis of pretrial publicity must demonstrate on the record that the publicity at issue caused one or more of the seated jurors to form a fixed opinion prejudicial to her defense. However, as noted *supra*, we have recognized that pretrial publicity may be so inflammatory or inculpatory in nature, and so sustained and pervasive in the community, as to relieve the accused of her burden in this regard, whereupon, regardless of the seated jurors' indications that they could perform their duties fairly and impartially, this Court will presume prejudice and order retrial.
>
> In determining whether pretrial publicity is sufficiently inflammatory or inculpatory as to implicate this presumption, we have consistently looked to whether the publicity's content is likely to cause readers to become prejudiced against the accused,

identifying as particularly suspect publicity which is sensational, inflammatory, and slanted toward conviction, rather than factual and objective; reveal[s] the defendant's prior criminal record, if any[;] referred to confessions, admissions or reenactments of the crime by the defendant, or is derived from official police or prosecutorial reports. In determining whether publicity is sustained and pervasive in the community, we have looked, *inter alia*, to the time between the publicity and trial, the nature and size of the community, opinion polling, and/or the statements of actual venire as elicited during the jury selection process. However, we have noted that, even where inflammatory or inculpatory public is disseminated in a sustained fashion and pervasively throughout the community where that publicity is followed by a "cooling off" period sufficient to dissipate its prejudicial effect, a change of venue is unnecessary.

In reviewing a trial court's determination of whether pretrial publicity requires a change in venue, because the trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change, we reverse the determination only where it constitutes an abuse of discretion.

***Commonwealth v. Walter***, 119 A.3d 255, 269-70 (Pa. 2015) (citations, and quotation marks omitted). This Court, upon review of a trial court's order denying a change of venue "must very carefully scrutinize such an order to ensure that a sound discretion has been exercised," and, in doing so, this Court has "the duty to make an independent evaluation of the circumstances." ***Commonwealth v. Cohen***, 413 A.2d 1066, 1073 (Pa. 1980).

Here, Appellant asserts that she "brought to the [trial] court's attention that over 120 articles had been published in the local newspaper related to [her] case," and that, "[a]t no point, did the trial court review any of these articles referenced." Appellant's Brief at 12-13. This Court is unable to materially respond to this claim for multiple reasons.

First, there does not appear to be any information in the certified record that reflects the trial court's ruling on the pre-trial venue motion. Appellant has not directed this Court to a location in the certified record which reflects the lower court's ruling. By virtue of the fact that the trial court reserved any ruling on the motion until jury selection, this Court would expect that the ruling occurred during the *voir dire* that occurred on April 12, 2021. Defendant, however, has failed to ensure in the certified record the notes of testimony from that proceeding. Additionally, the trial judge did not preside over the *voir dire* session so the lower court's opinion does not reflect the circumstances and reasoning for the court's denial of the pre-trial venue motion, if a ruling was issued. Based on the current state of the certified record, this Court is unable to glean anything about the trial court's pre-trial ruling in question or even confirm that it occurred.[2] By extension, there is nothing in the record to support or contradict Appellant's complaint about the trial court's supposed lack of pre-trial review of news articles.

---

[2] Appellant asserted in her post-sentence motion that the trial judge issued a "verbal order" denying the venue motion on the first date of trial on April 14, 2021. Post-Sentence Motion, 7/13/21, ¶ 7. The notes of testimony for that date start with a reference to the swearing of the jury and the court's introductory instructions to the jury, but does not reflect any ruling on a venue change motion. The Commonwealth, on the other hand, referred to a ruling on the pre-trial motion by the *voir dire* judge during its arguments concerning Appellant's post-sentence motion. N.T. 8/2/21, 3 ("[The Commonwealth:] … I believe the Court's decision at the time of jury selection not to grant this motion was proper…"). The trial judge's opinion does not refer to any ruling and only mentions that the "jury was seated without issue" before another judge. Trial Court Opinion, 11/5/21, 5.

Second, even assuming *arguendo* that there was a denial of the pre-trial venue motion that remains *de hors* the record, this Court is unable to conduct any independent review of the denial of a change of venue motion because Appellant has not supplied us with any of the newspaper articles that her pre-trial and post-sentence motions generally addressed. To the extent that Appellant asserts that she "brought to the court's attention … over 120 articles," this Court is unable to confirm that. Her pre-trial and post-sentence motions only referred to the existence of "over a dozen articles" by a local newspaper called The Daily Item Newspaper, however, in both pleadings, she never offered citations to any of those articles or appended any copies of the articles. Omnibus Pre-Trial Motion, 1/27/21, ¶ 18; Post-Sentence Motion, 7/13/21, ¶ 8.

At the hearing on her post-sentence venue change claim, her counsel referred to "over 120 [articles] published by the Daily Item that have referenced this case and the circumstances surrounding [it]," and mentioned that he had printed out six of the articles. N.T. 8/2/21, 2. The court indicated that it was not in possession of the six articles that counsel supposedly printed out. ***Id.*** at 3 ("[The Commonwealth:] Your Honor, I have been provided with proposed exhibits. I am not sure if the Court has those, the six articles. The Court: I do not."). While the Commonwealth referred to the six articles as "proposed exhibits," Appellant's counsel never marked and moved them into the evidentiary record. Accordingly, they were never incorporated into the record certified for this appeal. In the alternative, to extent that Appellant

faults the trial court for not reviewing any newspaper articles, our review of the notes of testimony from the hearing on the post-sentence motion does not reflect any instance where Appellant's counsel offered the trial court copies of the six articles he supposedly printed out.[3]

In the absence of any record of the pre-trial ruling in question or copies of the articles generally references by Appellant's claims below, this Court is unable to make any determination as to whether the trial court abused its discretion in denying Appellant's venue motions or whether the pre-trial publicity would have had any bearing on the ability of the jurors to render an unbiased verdict in this case. By presenting this claim on appeal based only on a diminished, if not absolutely incomplete, record, Appellant waived the

---

[3] In the absence of any evidentiary proffer as to this claim, the trial court relied on the rulings of his pre-trial counterparts and the absence of any issues with the jury during the trial in denying the post-sentence venue claim:

> THE COURT: I just wanted to -- I reviewed the whole record in the case prior to this hearing. I just want to point out I did not conduct the Voir Dire in this case, it was conducted by Judge Rosini.
>
> The first Motion for Change of Venue actually was ruled upon by Judge Saylor. So, all of my colleagues in the Northumberland County Court have had a hand in this case one way or the other, and all of them, including myself, believe that there was no prejudice by any of the jurors that were selected for the jury pool.
>
> I conducted the trial. I had no problems with any of the jurors during the entire trial, as counsel themselves knows. So that being the case, I am going to rule right from the bench and deny the Motion for Change of Venue and/or New Trial. That's all.

N.T. 8/2/21, 4.

instant claim. ***See, e.g., Commonwealth v. Bowser***, 624 A.2d 125, 132 (Pa. Super. 1993) (defendant waived a challenge to the denial of his request for a change of venue due to pre-trial publicity, where the alleged pre-trial publicity, consisting of several newspaper articles, was not included in the record on appeal).

In her remaining issue, Appellant challenges the sufficiency of the evidence. Appellant's Brief at 15-16. In support of this claim, she alleges that: (1) "no witness stated that [she] contradicted her statement or created confusion with PSP Stonington's investigation;" (2) "[t]he only evidence the Commonwealth offered to pro[ve her] obstruction and hinderance of the investigation was a cell phone log, which was circumstantial to the elements of the crimes;" (3) there was "no direct evidence" of her guilt; and (4) "the one piece of evidence suggesting [that she] committed any of the offenses charged [wa]s circumstantial." ***Id.*** Appellant fails to demonstrate an entitlement to relief because the Commonwealth was able to fully sustain the charges through the presentation of circumstantial evidence and, in any event, Appellant fails to review the evidence pursuant to applicable standard of review.

The standard of review utilized in sufficiency claims is well-settled:

[O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof

- 12 -

by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Lynch*, 242 A.3d 339, 352 (Pa. Super. 2020) (citation omitted; alterations in original). The Commonwealth is permitted to "sustain its burden by means of wholly circumstantial evidence, and we must evaluate the entire trial record and consider all evidence against the defendant." *Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa. Super. 2013) (citation omitted).

To prove Appellant's guilt for obstruction, the Commonwealth needed to demonstrate, beyond a reasonable doubt, that, "with intent to prevent a public servant from investigating or prosecuting a report of child abuse under 23 Pa.C.S. Ch. 63, [Appellant] by any scheme or device or in any other manner obstruct[ed], interfere[d] with, impair[ed], imped[ed] or pervert[ed] the investigation or prosecution of child abuse." 18 Pa.C.S. § 4958(b.1).

To prove Appellant's guilt for hindering apprehension or prosecution, the Commonwealth needed to demonstrate, beyond a reasonable doubt, that, "with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime[, Appellant] provide[d] false information to a law enforcement officer." 18 Pa.C.S. § 5105(a)(5).

To prove Appellant's guilt for false reports to law enforcement authorities, the Commonwealth needed to demonstrate, beyond a reasonable doubt that, Appellant "report[ed] to law enforcement authorities an offense or other incident within their concern knowing that it did not occur." 18 Pa.C.S. § 4906(b)(1).

Here, the scheme for obstruction that Appellant engaged in with the intent to prevent a public servant from investigating or prosecuting a report of child abuse was that she would say that she was present in the home at the time of A.P.'s injury so she could claim that she was an additional witness that could allege that A.P. sustained her injuries through a naturally occurring seizure rather than as a result of abuse committed by her son, Mr. Burgess. The evidence sustained the existence of the scheme because Ms. Delcamp testified about the circumstances of Mr. Burgess's abuse of A.P., just prior to the seizure and during the absence of Appellant in their home, Appellant's arrival to the home between twenty and thirty minutes after the seizure started, and Appellant's assurances at the hospital to Mr. Burgess that she would claim to having been present at the home at the time of the seizure. N.T. 4/14/21, 50-54, 56-60, 63-65. Ms. Delcamp recalled that, while they were outside the hospital with Mr. Burgess, Appellant "said to not worry because she will say that she was there so there is another witness." *Id.* at 65; *see also id.* at 94-95 ("Don't worry, I'll say that I was there, too, and I'll be another witness."). Ms. Delcamp confirmed that Appellant made that statement after her son had told her about him throwing A.P. *Id.* at 94-95.

Ms. Delcamp also testified that she overhead Appellant telling Mr. Burgess in a waiting room in the hospital "that she would say that she was folding clothes the whole time so no one would get in trouble and there's another witness to the *story*." N.T. 4/14/21, 68-69 (emphasis added). The "story" that Appellant alluded to was the false information and reports that she would offer to the caseworker and law enforcement personnel investigating the circumstances of A.P.'s death.[4]

Multiple parties investigating the circumstances of A.P.'s injuries recounted that Appellant offered them accounts of her presence in the child's home at the time of the start of her seizure. Brittany Duke-Williams, a caseworker for the Northumberland Children and Youth Services testified that, at the hospital in the early morning hours following A.P.'s admittance, Appellant told her that she was in A.P.'s home and folding laundry at the time that A.P. had the seizure while A.P. was supposedly eating at a children's table by herself. N.T. 4/14/21, 30, 36-37.

---

[4] Ms. Delcamp also offered testimony reflecting that Appellant had engaged in an earlier scheme to hinder the investigation of abuse of A.P. in the months leading up to the seizure incident during which Appellant would loan her car to Mr. Burgess and Ms. Delcamp to help them evade impending visits from Children and Youth caseworkers on four or five occasions when A.P. had black and blue bruising. N.T. 4/14/21, 100-02 ("Q. Did [Appellant] know why you needed her car? A. Yes. Q. Why did you need to leave? A. Because there was bruises on us and they couldn't have Children and Youth see it. … Q. Was [Appellant] aware why you needed her car in order to evade Children and Youth? A. Yes. … Q. When did she loan you the car in order to evade Children and Youth? A. Every time he asked.").

Corporal Adrian Bordner and Trooper Brian Seibert of the State Police related similar accounts from Appellant about her supposed presence in the home during two interviews. N.T. 4/14/21, 162 (Corporal Bordner addressing the first interview of Appellant: "She stated while she was at the residence in Trevorton, at that point in time she was in a living room/dining room area. [A.P.] was in the kitchen at her little table eating a sandwich. She said at some point she heard a thump, and she heard her son yelling, "Mom" for her help, at which time she came in and observed [A.P.] having what she believed to be a seizure."); Commonwealth Exhibit 13, Transcript of Second Interview with Appellant, 10/11/19, 12 (Appellant: "So I heard him say '[A.P.'s first name].' And Jahrid was screaming, "Mom." And I went in there. And she was like, flopping really hard like -- I don't know. It wasn't just the arms or the legs. It was the whole body. And then Jahrid -- I called 911."), repeated at N.T. 4/14/21, 175-76; *id.* at 213 (Trooper Seibert addressing the first interview: "[Appellant] stated she was there at the residence. She stated that [A.P.] was eating a sandwich at her little table. She stated [A.P.] got up. She stated [A.P.] then fell and hit her head and started seizing.").

In the second interview, Appellant changed her account such that she was supposedly not present when A.P. fell and started having the seizure. N.T. 4/14/21, 203 (Corporal Bordner addressing changes in Appellant's account during the second interview: "Well, when she was pressed on some things, some discrepancies in stories, then it was a little more wish washy … she would say she was there. Then when she was asked to give a specific,

- 16 -

well, what time did you get there? What happened prior to hearing the thump, you know, then it was evasiveness."); *id.* at 213 (Trooper Seibert: "During the second interview her story changed … She said that she was not there when [A.P.] fell. She said that her son had called her and asked her to come back to the house.").

The Commonwealth sought to corroborate Appellant's absence from the victim's home at the time of abuse/seizure incident through information that the state police had obtained from the phones that Mr. Burgess and Appellant were using on the night in question. An extraction report for a cellular phone recovered from Appellant's car revealed that, on the night of the abuse/seizure incident, someone conducted a search on the phone at 9:39 p.m., for "How long does a child have a seizures [sic]?" N.T. 4/14/21, 153-54. That phone also received two incoming calls from a combined contact entry for Ms. Delcamp and Mr. Burgess ("Samm N Jahrid") at 9:15 p.m. and 9:31 p.m. *Id.* at 156. That phone was then used to make a 9-1-1 call at 9:47 p.m. *Id.* at 156, 216; *see also id.* at 147-48 (Corporal Kowalski discussing his extraction of data from the cellular phone recovered from Appellant's car and his act of providing that information to Trooper Seibert).

An extraction report for a cellular phone that Ms. Delcamp confirmed that Mr. Burgess used on the night of the abuse/seizure incident revealed that that phone was used for conducting the following searches at the referenced times: (1) "What do you do during a seizure?" at 8:59 p.m.; (2) "How do you get a seizure to stop?" at 9:12 p.m.; (3) "How long do seizures last?" at 9:15

- 17 -

p.m.; and (4) "What do you do during a seizure?" at 9:18 p.m. N.T. 4/14/21, 216; *see also* N.T. 4/14/21, 97-98 (Ms. Delcamp confirming Mr. Burgess's use of the phone she turned over to the police), 142-46 (Corporal Jeffrey Kowalski discussing his extraction of data from the phone turned over to him by Ms. Delcamp and his act of providing that information to Trooper Brian Seibert). The extraction report also confirmed that that phone had placed the calls to Appellant's phone at 9:15 p.m. and 9:31 p.m.; the former call lasted twenty-four seconds, and the latter call lasted two minutes and five seconds. *Id.* at 217, 220-21.

The Commonwealth also sought to corroborate Ms. Delcamp's account that A.P. had a seizure after an incident of abuse, in contrast to Appellant's version of the events that had the seizure occurring while the child was supposedly eating by herself. Dr. Paul Bellino, an expert in pediatrics with a specialty in identifying pediatric abuse, testified concerning his opinions that a seizure would not have caused the injuries that were sustained by A.P., the injuries were "from [A.P.] being beaten," and "a seizure after such a trauma would be fairly expected." N.T. 4/14/21, 105, 113-14 ("There is absolutely no doubt that she was just beaten to the point where she succumbed from the neurologic devastation that occurred during that beating."); *see also id.* at 119-20 (Dr. Bellino recounting that he documented "about 45 different discrete areas of bruising" on A.P. and that A.P. had fractures of both of her collar bones, one rib fracture on her right side, six different rib fractures on her left side, and fractures of her legs, arms, and wrists).

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner (as dictated by the standard of review), it supported the verdict reached by the jury. Ms. Delcamp's testimony about Appellant's statements at the hospital demonstrated the scheme by which Appellant intended to obstruct an investigation into the abuse of A.P. by falsely claiming that she was present at the time of the start of A.P.'s seizure. The expert testimony from Dr. Bellino and the information extracted from the cellular phones gave rise to the reasonable inference that Appellant was not in A.P.'s home at the time that Appellant had claimed to the county caseworker and the state troopers. Dr. Bellino's expert opinion established the infliction of traumatic abuse that was absent from Appellant's account and that account was inconsistent with the information gleaned from the phones. If Appellant was present in the home at the time of the start of A.P.'s seizure as she alleged then the phone used by her son would not have been calling her phone at 9:15 p.m. and 9:31 p.m. Moreover, the fact that the phone used by Appellant's son was searching for information about seizures at least fifteen minutes before the 9:15 p.m. call to Appellant's phone supported the conclusion that her son was summoning her to the home after-the-fact.

This evidence amply proved that Appellant offered false information to law enforcement authorities for the purpose of preventing an abuse investigation of her son, and thus sustained the verdicts. ***See, e.g., Commonwealth v. Holt***, 270 A.3d 1230, 1235-36 (Pa. Super. 2022) ("[O]ne who makes false statements in response to a police inquiry 'provides' false

statements, and the legislature's amendment of the statutory language was designed to include such statements within the ambit of Section 5105(a)(5)."); **Commonwealth v. Hlatky**, 626 A.2d 575, 582 (Pa. Super. 1993) (false statements made in response to questions by the police when the defendant had knowledge of the true nature of the incident was sufficient to sustain a conviction for making false reports).

Judgments of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/06/2022